## MARY E. LESLIE v. S. E. CARTER and CHARLES A. BYRD, Appellants.

### Division One, February 29, 1912.

1. **FRAUD: Confidential Relation: Concealment: Setting Aside Deed.** Plaintiff was one of five heirs to 538 acres of farming and mining lands, which had been leased on a royalty basis for fifteen years, with no large returns. Her mother had died, and she had gone when a mere girl to Washington to live with a sister, there had married and gone with her husband to Alaska and lived there, and her brother, the defendant, looked after her interests in the land, collecting the rents and royalties, and she trusted everything to him, for whom her letters show she entertained strong affection. In all his letters to her he wrote discouragingly of the prospect of selling the property, and in one offered her $5000 for her interest, saying he was not writing to discourage her but wished he "could write something more favorable." At that time he had recently bought the interest of another brother for $10,760 and that of the widow and minor son of a deceased brother for the same, and stated in the 'letter that he had bought the interest of her sister in Washington for $3500. His own evidence showed that the property at that time was worth from $100 to $150 an acre, and at the lowest of those estimates her fifth interest was worth $10,760. *Held*, that there was concealment, and an abuse of a confidential relation, and the deed by which she conveyed her interest to him for $5000 should be set aside for fraud.

2. ———: ———: ———: ———: **Innocent Purchaser: Son-in-Law.** A father has a right to be generous with the husband of his daughter, but when they are both called into court to answer a charge of fraud by the father against his sister in purchasing her fifth interest in land, and the son-in-law comes in the role of innocent purchaser for value from the father, he is not entitled to credit for so much of the value he claims to have expended as came to him through the generosity of the father out of the property acquired through the fraud of the father. And the evidence showing that the brother acquired his sister's fifth interest in the property through fraud, and that the brother thereafter conveyed three-fifths of the property to his son-in-law, who paid for it only by a note which in fact was never paid out of his own money, and that all he ever paid on the property was money obtained by a mortgage on the three-fifths interest, with which he bought the two remaining fifth interests, the said grantee will not be held to be an innocent purchaser for value.

3. ———: ———: ———: ———: Laches: Delay. Laches is an equitable defense, and is sometimes allowed when the period of limitation prescribed by the statute has not elapsed; but it is never allowed unless the delay has produced such a change in conditions that the defendant is put at a disadvantage, and not always then. Where the delay has worked no injury to the defendants, and they are as well equipped to make their defense at the trial as they would have been at any previous time, the defense of laches will not be allowed.

4. ———: ———: ———: ———: ———: Restitution: Mining Leases. It is no answer to a charge of obtaining a deed to land by fraud that the defendants have made such a disposition of the property that it would embarrass them to be required to make restitution. The fact that the fraudulent grantee has conveyed it to a son-in-law who is not an innocent purchaser for value, and that they have made mining leases on it, does not affect the merits of the case. The interests of the lessees is not an issue in such suit, nor is the validity of the leases, nor is the defrauded grantor responsible for any controversies in which those leases may involve the defendants.

5. ———: ———: ———: ———: ———: Allaying Suspicion. Where the conduct of the fraudulent grantee after the conveyance was made was such as to allay the suspicions of the defrauded grantor, she is not chargeable with laches in bringing the suit, if she brings it shortly after her suspicions are aroused by information of the facts.

6. ———: Setting Aside Deed: Accounting: Services of Grantee in Obtaining Leases. Where the increase in the value of the property after defendants had fraudulently obtained the deed from plaintiff was due to the developments of the minerals through the operation of the mines on the land by lessees, the services of the grantee for his activity in obtaining the leases should not be taken into consideration in the accounting, since an estimate of the value of such services would be mere conjecture, and defendant was in possession through his own wrong.

7. ———: ———: ———: Bonus on Lease. Where the grantee has obtained a judgment against a bank for a bonus on a lease of the lands embraced in the fraudulent deed, the plaintiff grantor, in the accounting, is entitled to her proportionate share of that judgment when collected, less attorney's fees and costs.

8. ———: ———: ———: Interest on Money Paid: Royalties. The grantee is entitled to six per cent simple interest on the money paid by him to the grantor for the fraudulent deed from the date it is paid to the date the grantor files her

petition to have the deed set aside for fraud in which she tenders back the money received. But if in the meantime the property has been leased she is entitled to have deducted from the amount of her payment the money that the grantee has received in the way of royalties on ores mined from the property.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

REVERSED AND REMANDED *(with directions).*

*George Hubbert* and *Frank L. Forlow* for appellants.

(1) The plaintiff's laches, and especially with her warning and information from others adverse to defendant's good faith towards her, for at least two years, according to her own testimony, about a matter so open to inquiry; and her express acquiescence in the conveyance, as shown by her conduct and letters, from time to time, for nearly two and one-half years before suit, constitute an effectual bar against her as to any remedy, under the well established rules of equity. Kerr on Frauds and Mistake, 299, 305; Klive v. Vogel, 90 Mo. 247; State ex rel. v. West, 68 Mo. 229; Dexter v. McDonald, 196 Mo. 399. The effort to excuse the plaintiff's laches by alleged fraud and continuing confidence cannot avail. But it shows plaintiff's conscious need of some excuse. Callan v. Callan, 175 Mo. 346; Jones v. Rush, 156 Mo. 373; Newman v. Oberle, 90 Mo. 666; Powell v. Adams, 98 Mo. 598. (2) The evidence does not show any material fraudulent misrepresentation of fact by defendant Carter, believed, relied and acted on, by plaintiff, to her injury, under circumstances excusing her from exercising her own judgment with reasonable prudence; without which she can have no standing in equity, nor claim for the relief sought by her. Hitchcock v. Baughman, 36 Mo. App. 222; Lewis v. Land Co., 124 Mo. 672; Nations

v. Pulse, 175 Mo. 86; 18 Ency. Pl. and Pr., 853; Lumber Co. v. Crommer, 202 Mo. 521; Wood v. Evans, 43 Mo. App. 230; Parker v. Marquis, 64 Mo. 38; Estes v. Desnoyers, 155 Mo. 587; Smith v. Dye, 88 Mo. 581. (3) Without proof of a relation of trust and confidence in fact, by which the will of plaintiff was subjected to the domination of defendant Carter; and also that he deceitfully availed himself of the relation and exercised an undue influence upon her mind; also that he thereby induced her to sell to him to her damage, when she would not have done so otherwise—without each and all of these things being proved, the plaintiff should not have prevailed below; and yet such proof was not made. Peckham v. Lalone, 164 U. S. 255; Studebaker v. Cofeld, 159 Mo. 612; 2 Beach on Contracts, sec. 1391; Dickson v. Kempinsky, 96 Mo. 252; Cutts v. Young, 147 Mo. 587. (4) The lugging into this case of alleged frauds against Laura Miller and William Carter and George Carter, must fail of the purpose designed. The George Carter case has been submitted and is under the consideration of this court. The Laura Miller case has been amicably settled. The William Carter case is pending in this court on appeal by him and not by defendants. Each case must stand upon its own merits. Collateral transactions with strangers to the case on trial are so clearly irrelevant that they should never have been offered, and cannot be considered. Jones on Evidence (2 Ed.), sec. 140; Edwards v. Warner, 35 Conn. 517; Williams v. Robbins, 15 Gray 590. Equity is always conditioned that defendant's rights are to be conserved and protected; and one of the means of so doing is to require restoration of the *status quo* or its equivalent, failure to do which will preclude cancellation of the instrument in which the rights of all parties are tied up; for even an old wrong cannot, in the contemplation of equity, be righted by a new one. Pom. Eq. Juris., sec. 915; 18 Am. and Eng. Ency. Law, 858-60; Brad-

shaw v. Yates, 67 Mo. 221; McClure v. Lewis, 72 Mo. 323. (5) Compensation should at least have been allowed Byrd, proportionately for his expenditure of time, labor and money, and the improvement of the premises, by which their value and products were enhanced to the benefit of all owners; for owners in common may improve with the full assurance of being protected in so doing, to the extent of a contribution by each owner of his fair proportion of the enhanced value so added to the premises and products. Andrews v. Connoly, 145 Fed. 43; Freeman on Cotenancy, sec. 510; Hall v. Piddock, 21 N. J. Eq. 314; Coberly v. Coberly, 189 Mo. 1; Broyles v. Waddel, 58 Tenn. 32. (6) Byrd should have had six per centum annual interest, for the use of the $5000 for the time she had it, if he stand decreed to account for the rents, issues and profits of the land for that time. No less could make him whole under her tender of equities by her petition. Smith v. Townsend, 92 Am. Dec. (Md.) 637; McClure v. Lewis, 72 Mo. 314; Thornton v. Ogden (N. J. Eq.), 7 Atl. 619; Andrews v. Connoly, 145 Fed. 43. (7) The change of the conditions of the property, the acquirement by strangers of rights therein, the development of mines unopened before, all during the time passing after the making of the deed and the acquisition of the mining and speculative property by Byrd and others through him from Carter—these things are substantial objections in equity to the attempt to administer justice so long after the fact, upon charges of deceit therein. Spurlock v. Burnett, 170 Mo. 372; Phillips v. Hardeberg, 181 Mo. 46; 18 Am. and Eng. Ency. Law 102, 103; Hatcher's Case, 139 Mo. 614; Bliss v. Pritchard, 67 Mo. 181.

*W. M. Robinson* and *Thomas & Hackney* for respondents.

(1) The defendant Carter having been the trusted agent of his sister in the management of her one-fifth

. interest in the property in controversy ever since the death of her brother, A. G. Carter, in 1903, having in charge her interest in said property, collecting her rents and royalties and paying the taxes, and being her agent for the sale of the property, he is not permitted to enter into any transaction with her on his own behalf respecting the subject-matter of the agency unless he acts with entire good faith and without any undue influence or imposition and makes a full disclosure of all of the facts and circumstances attending the transaction.   31 Ency. Pl. and Pr., 1442; 2 Pom. Eq. Jur. (2 Ed.), sec. 955-956; Kerr on Fraud and Mistake, 173; Bartholomew v. Leach, 7 Watts (Pa.), 472; Colbert v. Shepherd, 89 Va. 401; 1 Am. and Eng. Ency. Law (2 Ed.), 1071; Ralston v. Turpin, 129 U. S. 675; 1 Story's Eq. Jur., par. 315; Harris v. Tremenhere, 15 Ves. 34; Wadsworth v. Adams, 138 U. S. 380; Gay v. Gillian, 92 Mo. 250; Dausman v. Rankin, 189 Mo. 703; Ross v. Payson, 43 N. E. 399; Hall v. Knappenberger, 97 Mo. 509; Reed v. Carroll, 82 Mo. App. 108. (2)   The deed from the plaintiff to defendant Carter was obtained by him by fraudulent concealment of the conditions of the property, and its value, and by undue influence exerted over the plaintiff.   Reed v. Carroll, 82 Mo. 108; Morley v. Harrah, 167 Mo. 74; Derby v. Donehoo, 208 Mo. 699; Evans v. Evans, 196 Mo. 19; Elmore v. Johnson, 153 Ill. 513; Hallwood v. Mansfield, 59 Ill. 496; Laclede Bank v. Keeler, 109 Ill. 385.   (3)   The evidence clearly shows that defendant Byrd was not an innocent purchaser and that whatever conveyances were made to him he received the same to hold for his codefendant.   A purchaser on credit is not an innocent purchaser.   And the fact that the pretended purchaser may have given the vendor his note therefor, does not render him an innocent purchaser, unless the note has been paid before notice or unless it has been negotiated and is in the hands of an innocent holder.   Arnholt v. Hartwig, 73 Mo. 484; Young

v. Keeler, 94 Mo. 590; Cheek v. Waldron, 39 Mo. App. 25; Wetmore v. Woods, 62 Mo. App. 265. The law charged Byrd with notice that a deed procured by Carter while the agent of his sister for the sale of the property for less than its value was a fraud on the plaintiff and he was put on inquiry, even if he had paid a full consideration, as to her rights in the property. Plow Co. v. Sullivan, 158 Mo. 440; Bank v. Tobacco Co., 155 Mo. 602; Eck v. Hatcher, 58 Mo. 235; Leavitt v. LaForce, 71 Mo. 356. (4) Plaintiff was guilty of no laches in the bringing of her suit. She was not called on to take action until she had notice of the wrong committed against her. Real Est. Co. v. Lindell, 142 Mo. 61; Howell v. Jump, 140 Mo. 440; Napton v. Leaton, 71 Mo. 358; Davis v. Forman, 229 Mo. 27; 2 Pomeroy's Eq. Jur., 917. Relationship of the parties is entitled to great weight when the question is one of laches. Wright v. Wright, 37 Mich. 56; Case v. Case, 26 Mich. 483; Van Buskirk v. Van Buskirk, 148 Ill. 9. There is no evidence of any acquiescence of the plaintiff and no delay of hers induced the defendants or either of them to change their position. Newman v. Newman, 152 Mo. 515; 12 Am. and Eng. Ency. Law (2 Ed.), 544; Ross v. Payson, 43 N. E. 399; Walther v. Null, 233 Mo. 123.

VALLIANT, J.—This is a suit in equity to annul a deed made by plaintiff conveying her one-fifth interest in 538 acres of land in Jasper county to defendant Carter, on the ground that it was obtained by fraud, and to annul also a deed from Carter conveying the same interest to defendant Byrd, on the ground that it was without consideration and made to further the fraudulent purpose by which defendant Carter obtained the deed from plaintiff. Plaintiff tenders back the purchase money paid her by Carter and prays an account of rents and profits. Defendant Carter's answer was a general denial; defendant Byrd's answer

was a general denial, and a statement of facts going to show that he was an innocent purchaser for value, and that plaintiff was guilty of laches. The finding and judgment were for the plaintiff on all the issues, and the defendants appealed.

The 538 acres of land were owned by Washington G. Carter, who died in 1874, leaving his widow and six children his heirs, four sons, George, S. E., A. G., and William, and two daughters, Mary, the plaintiff, and Laura; George died sometime in the eighties, never married; the widow died in 1887; the five surviving children, three sons and two daughters, thus inherited the land. The plaintiff was four years old when her father died; she lived with her mother and the family of children on the farm until after the mother's death. In 1890 plaintiff went to live with her married sister, Laura Miller, in the then Territory, now State of Washington, where she lived for a few years and was married and went with her husband, William M. Leslie, to Alaska, where she has ever since resided and where she was residing when the transactions complained of in her petition occurred. After the plaintiff left Missouri, and went to Washington and thence to Alaska, her brother A. G. Carter, until his death, which occurred in 1903, acted as her agent, collected her share of the rents and sent the same to her; after his death the defendant Carter performed that office for her. The land lies in the lead and zinc mining district of Jasper county; there had been some mills and mining on this land during the above period, but the mining had not been a success; still there were prospects and the market value of the land fluctuated as those prospects brightened or faded. November 15, 1905, defendant Carter wrote the plaintiff offering her $5000 for her one-fifth interest in the land; the contents of the letter will be more particularly referred to again herein. December 9, 1905, plaintiff wrote a letter of that date accepting the offer

and sending a deed as he had requested to a bank in Webb City to be delivered to him; the contents of that letter will also be referred to again. That is the deed which plaintiff seeks to annul in this suit. Plaintiff avers and Carter denies that he was her confidential agent, in whom she placed implicit trust; she avers and he denies that he deceived her as to the conditions existing in regard to the mining status and the mining prospects which influenced the value of the land, that the interest which she was thus induced to part with for $5000 was worth at least $50,000. As already said after the death of A. G. Carter the defendant S. E. Carter looked after the plaintiff's interests, collected her rents and sent them to her. Further bearing on the issue of the confidential relation the testimony for plaintiff was to the following effect:

After the plaintiff left the home in which she had been reared, and went to Washington and thence to Alaska, she had been absent from the State, except a short visit in 1895, for fifteen years, and during that time she knew nothing of the property or its condition except through letters from her two brothers, A. G. Carter while he lived, and S. E. Carter, the defendant, afterwards. The letters from defendant Carter to plaintiff, and from her to him, are of the most affectionate character; the writers seem, though so long separated, to have never lost interest in each other or to have ceased their love as brother and sister. The letters though not models of literature are models of fraternal love, and the business features that necessarily come into the letters, when they relate to business, show only a desire to promote the welfare of each other. The letters are altogether too long and numerous to insert all of them in this opinion, but such is our estimate of them. A. G. Carter looked after the plaintiff's business affairs while he lived and we are not concerned with that, but it is the affairs of

the plaintiff while the defendant S. E. Carter looked after them that are in question.

In 1890 the plaintiff, her brother William and sister Laura, executed a mining lease for fifteen years to their brothers A. G. and S. E. Carter, and under that lease the two latter made several subleases, but the operations had not proven very successful. October 20, 1905, defendant Carter wrote plaintiff, sending her a deed to be executed by her extending the lease for ten years, which she promptly executed and returned. In his letter of November 15, 1905, he thanked her for her prompt action in executing and returning the extended lease, and took occasion to say that he did not have at that time as much hope of selling the land as he had had, because the company that thought of buying had a heavy task in the matter of drainage, and the company that was there before said they had lost $150,000, and he said he believed those figures were about right. The heirs had for several years been trying to sell the land; the negotiations being conducted by A. G. and S. E. Carter while the former lived and by the latter after the death of the former. In 1903, an option had been granted to one Hunter to purchase the whole tract for $81,000, but that failed.

In November, 1904, S. E. Carter conducted negotiations which led to an option for the sale of the land at a price which was to realize to each heir $10,760; the deeds were to be made to Charles A. Byrd through whom, for convenience, the title was to pass, if the sale should be consummated. Accordingly on November 30, 1904, Carter wrote the plaintiff inclosing the draft of a deed to be executed for her and her husband, conveying her one-fifth of the land. The deed was to be deposited in a bank in Webb City in escrow to be delivered when the price was paid. In the letter he said: ''I have sent a similar deed to all of the children. I have what I think is a good chance to dispose of the

240 Sup.—36

property, and as George's interest will have to be procured through court it will take sometime, and then the people who are figuring on taking it expect to form a stock company and sell stock." The George referred to was the minor son of A. G. Carter, deceased. Plaintiff in her letter replying, began: "My dear Brother: I received your letter, together with deed for land. We signed deed and returned it as soon as possible. I hope everything goes all right this time. It has been such a long time since I heard from any of you folks I was so glad to hear even through a business way." The letter proceeds in a very sisterly tone and closes with, "Best love to you all." That option also failed of consummation.

On the question of fraudulent concealment and misrepresentations there was a great deal of testimony relating chiefly to the condition of the property in the way of mining and mining prospects. On the part of the plaintiff there was testimony tending to show that in the fall of 1905, at the time the defendant Carter made his offer of $5000 to plaintiff for her interest, there were on the land three or four mills completed or in course of construction, several shafts being sunken, and much drilling with encouraging prospects, and the testimony on the part of the defendant did not diminish these works, but tended to show that they were constructed in the spring of 1906. One witness for the plaintiff testified that in a conversation with Carter in the fall of 1905, the latter said the land was worth $275,000. That witness also testified to the erection of mills, sinking of shafts and drills on the property at that time. An effort was made to impeach this witness, several testifying that his reputation for veracity was not good. But there were several other witnesses against whom no impeachment was attempted, who testified that the land was worth at that time from $250 to $500 an acre. Witnesses for defendant testified that it was worth $100 or $150 an

acre. The testimony showed that at the time he made this offer of $5000 to plaintiff he had bought or contracted to buy his brother William's one-fifth interest for $10,760, and the interest of the widow and heir of A. G. Carter for the same amount. And that he had bought the interest of his sister Laura for $3500, that she afterwards brought suit against him to set aside the sale, and he compromised the suit by paying her at the rate of $100 an acre—which would amount to about the same that he paid William. The purchase from Laura was in the summer of 1905, and regarding that purchase he wrote the plaintiff that he had bought Laura's interest for $3500 and had taken a risk in investing that much money in the land under the conditions.

June 5, 1905, plaintiff wrote her brother that her husband was in some trouble, that their money was tied up and they needed $2500, and asked him to lend her that amount; he very promptly complied with the request. July 9, 1905, she wrote enclosing the note of herself and husband for the money so loaned them and in the letter she asks if he thinks he will be able to sell thè place that year, saying she hoped it could be sold "because it would be so much better for us all before any more of us passes away." October 21, 1905, she wrote inclosing $500, part payment of the $2500 loan, and referred to his kindness in helping them over a bad place, and again expressed the hope that he would be able to sell the place. We quote from her letter to show the kind sentiment she entertained for her brother and her interest in the affairs of the family. After discussing the business relating to the loan and the part payment, she went on in that letter to say:

"I think you do yourself an injustice when you say you are a poor hand to write you certainly a most interesting letter you must have enjoyed yourselves while in the mountains this summer I think I should

enjoy the praries I have seen nothing but mountains for so long.

"I'm sending you a pansy, I picked from my garden today so you can see it isn't so wintry in the va ev flowers and hardy vegetables do very well pansies and Asters last the longest.

"Is Bill dissatisfyed where he is liveing since they lost their babie? He owns the farm dosent he? I don't think Belle ever liked the old home place very well I hope it can be sold before a great deal has to be laid out on it. I had so hoped something could be done before that deed expired but it can stand just as it is cant it without any change.

"The children and I are alone as usual I stay here while Wm is away on account of the children being in school, schools are very good in all the incorporated towns of Alaska.

"I must close for this time with best love to Mahala and all the rest of the family yourself included

"I remain as every your
"Affectinate Sister
Mary C. Leslie."

It was in answer to that letter that defendant Carter wrote proposing to buy the plaintiff's interest for $5000. His letter making the offer is such an important feature in this case that we are forced to copy it in full, literally if possible.

"November 15, 1905, Mary E. Leslie. Dear Sister I received your ever welcom, Letter of Oct. 23th also $500.00 and $18.00 as interest which, I have credited on your, note now, Mary, I did not kneed this Money at preasant and you kneed not weary about the remainder for i will let you know in plenty of time if i kneed it I was indeed sorrow to hear that every thing was not going as pleasant as hoped for I hope things may turn more favorable to you and your family and that William will succeed favorable to him in his Litigation. Mary you have now idea how i appre-

ciated that little flower, that token of love and friend-
ship you sent me in your Letter I must thank you for
your prompt action in exicuting and sending back thos
papers they have ben received in good shape I do not
have as much hopes now of selling as i had some time
ago for this company that was wanting to buy this
Land is the Company that is trying to Drain this track
of Land and thare superintendant told me that they
had allready spent $160000.00 in Pumping and machin-
ery and ect this is on the Baker Land and our togather
the amarican company that was thare before them I
understand clame to have lost about 150000.00 I be-
lieve thease figurs ar not far from right all though
they seam very large to one that is not familler with
a large Pumping propsetion I know thare expenses is
very large Mary, I have tryed very hard to sell this
Land but when thease things come up it is all off the
mills that has ben on our Land hear to for has not as
you know ben a success and if we can not get a mine
that is a money maker started somewhare on it it
will not be a easy matter to sell and Georges Interest
is somewhat of a drawback with some prospective pur-
chasers for fear a goob title could not be made through
the court and others think it would take to much time
& so on I am not writing this to discorage you I wish
I could write you something more favorable this may
some time prove to be a very productive property and
it may be a good thing for us if we coulb not be able
to sell at all no one can tell what the future may bring
fourth I do not want to advise you in any way in the
sale of this Land I just sending the condetions as I
see them I all ways was in favor of partetioning this
Land in Brothers Lifetime for I thought, if Myne was
off by it self i could dispose of it and I think yet that
if I could sell this land in small tracks it could be
sold to much better advantage I think if it should fail
to develop for mineral property that a portion could
be disposed or to small farmers and market gardners

on time payments say about five years time on a 10 acre track or something like that you ask, me if Brother william owned his farm in McDonal. Co yes and i think it is all clear I think thèy are in comfortable surcamstanc thare are about to sell and came up hear thay are thinking of buying the old judge stevinson farm, where Lum lives he Lum is thinking of going to Panhandal Texas. I have ben offering to trade Brother william some webb city property and also some johns town property for his interest in the old home but we have not yet traded Bell is very anxious she says to sell out before any more complications arise by death or other wise

now Mary I will make you this offer for your part in the old home if you want to take it I will give you five thousand Dollars $5000.00 then I can possible make arrangements to sell in small tracks if I buy Billeys part I am not advising you to do this but it is all that I think I can possible give. I will send description of Land so you can execute if you desire and send to webb city Bank and instruct them to deliver to me when the money is at your credit this would make $25000.00 for the track quite a little sum it may be worth more after a while or it may be a great deal less if you conclude to do this let me know soon.''

December 9, 1905, the plaintiff wrote her answer to that letter, the first paragraph of which was:

''My dear Brother: Your letter of Nov. 15th has been before me for a couple of weeks and after some consideration and several sleepless nights I concluded to accept your offer. I hated awfully to sell what has always been such a fond memory to me but I know all things must change with time and it seemed the best to us all and you offer was generous for an individual although less than half what we had hoped to get but life is made up of disappointments. I hope it will be a successful investment for you and I'm sure it will

be Brother used to say he would rather trust your judgment than any one he ever knew.''

She then goes on to say that she has forwarded the deed as he directed, and asks him to invest the money for her as she has such confidence in his judgment.

There is a great deal more of the letter correspondence, but the above is a sufficient sample of the whole.

I.  Before taking up the evidence relating to the defenses made by the answer of defendant Byrd we will consider the evidence bearing on the questions of betrayal of confidence and fraudulent concealment of material facts.

It would be difficult to imagine a case of greater trust and confidence.  Here was a sister who, following the fortunes of her husband, had left the home of her childhood and youth and gone to a far away land, trusting all that she owned to her brothers, for whom, as her letters show, she entertained strong affection. When one brother died her affairs came exclusively into the care of the other, who assumed that agency and conducted it for two years before the transaction now complained of.  In the exercise of that agency he not only collected the little rents and royalties belonging to her, but was active in his efforts to sell her interest in the property in connection with that of the other heirs.   His business letters to her were not merely letters of business but letters of brotherly love, and in those letters he professed to give her all the information he had affecting the value of the property, and until the last year of his agency, 1905, the information seems to have been correct.  But in November, 1905, when he wrote the plaintiff offering to give her $5000 for her interest, the evidence shows that the mining prospects which gave value to the property were brighter than they had ever been, but he failed to give her that information.

Appellants in their briefs say that it was the developments made by the industry of defendant Byrd since that time that has given value to the property. The evidence does show that there have been developments, but those developments are the realizations of the fair prospects that then existed. In all his letters to the plaintiff defendant Carter wrote discouragingly of the prospect of selling the property. In his letter of November 15th he said he did not have as much hope as he had had of selling, because the company that was trying to drain the land had already spent $160,000 in pumping and the end was not yet, and that a former company had claimed that they had lost $150,000 in the same effort; he mentioned other discouraging matters, and then said: "I am not writing this to discourage you I wish I could write you something more favorable." He could have written something more favorable, but if he had done so the probabilities are that the plaintiff would not have accepted his offer. In the summer of 1905 he wrote the plaintiff that he had bought their sister Laura's interest for $3500, and that he thought he had taken some risk in paying that much for it. According to testimony introduced by defendants the land was worth from $100 to $150 an acre. That could not have been an estimate of its value as farm land only, for defendants' evidence shows that it was not very valuable as farm land; the estimates were based on the fact that ore was found on the land and its mining prospects were good. Besides, at the time this offer was made to plaintiff defendant Carter concealed from her the fact that he had already bought or contracted to buy the interests of William and that of the widow and heir of George at the price of $10,760 each. It was only the sister Laura who was away off in the State of Washington, and the sister Mary in far away Alaska, who were induced to sell, the one for $3500, the other for $5000.

The evidence justifies the finding and judgment of the trial court on the questions of betrayal of confidence and concealment of material facts.

II.  The next question is, was defendant Byrd an innocent purchaser for value?  There was a great deal of evidence on that issue which we will not attempt to compress into this opinion, but will only give its general character and our conclusions drawn from it.

In 1904, S. E. Carter negotiated a sale to be made of the whole property by which each heir was to receive $10,760 for his or her share, and deeds to carry that proposed sale into effect were executed by each of the heirs and deposited in a bank in escrow.  Those deeds were all made to defendant Byrd; he was not to be the real purchaser, but was selected by Carter as a convenient holder of the title, which he was to convey to the real purchaser when the proposed sale should be executed.  That sale was not effected and the deeds in escrow were withdrawn from the bank.

In February, 1906, Carter, then holding title to three-fifths interests, his own and those of his two sisters, executed a deed conveying to defendant Byrd those three-fifths, for which Byrd executed his promissory note for $32,280, and about the same time Byrd acquired the title to the interest of William Carter and that of the widow and heir of George Carter deceased, paying for each of those interests $10,760.  The good faith of the deed from Carter to Byrd is challenged, and the good faith in taking the title to the other two interests in Byrd's name is also challenged; it being contended that the one from Carter to Byrd was without consideration, and that Carter was the real purchaser of the two others' interests.

Byrd was S. E Carter's son-in-law; he was not a man of considerable property.  Until shortly before the transaction complained of he had lived on a farm of 114 acres belonging to his father-in-law, which he

rented at the yearly rental of one-third of the crop. He
left the farm and moved to town, where, for a while,
he conducted a butcher shop, which he afterwards sold,
but could not remember the price he received for it.
He testified that he engaged in the real estate business,
but to what extent he could not give any definite idea.
Then he went into the live stock business, and when
asked to state the extent of that venture said that he
owned two jacks and a stallion; he had also bought and
sold hogs, in all of which ventures he made money, but
how much he was unable to say. The assessment rolls
of the county showed that the total assessment of the
personal property of himself and wife for the year
1905 was $405. We gather the impression from the
evidence that he is a man of considerable intelligence,
business capacity and activity, but that he is, or at
least at the time of the transactions under discussion
was, not a man of sufficient means to purchase property
of the market value of $50,000. He testified that he
paid for the three-fifths that his father-in-law sold him
with his note for $32,280, and that he borrowed $15,000
by a mortgage on that property and used that money
with some other means he had to pay for the two other
interests at $10,760 each. Conceding the truth of what
he says the fact stands out clearly that he was greatly
favored in the transaction by his father-in-law. A
father has a right to be generous to the husband of his
daughter, but when they are both called into court to
answer a charge of fraud and the son-in-law comes in
in the role of innocent purchaser for value, he is not
entitled to credit for so much of the value he claims
to have expended as came to him through the gener-
osity of his father-in-law out of the property acquired
through the fraud charged. He undertook to show
that he had, before this, had a transaction with his
father-in-law by which he purchased or agreed to pur-
chase the 114-acre farm he had formerly lived on, and
had made some payments on that, and that when this

matter came up they cancelled that agreement and the father-in-law refunded the money Byrd had from time to time paid on that account and he paid that as a part . payment on the $32,280 note. His testimony as to ʼthat transaction was not very clear, but conceding it to be true it does not account for the sale of the three-fifths interest in this valuable property for $32,280 paid only in the note of Byrd and wife except on the theory of the generosity of Carter to his daughter and son-in-law. Carter had a right to be as generous as he pleased with his own, but not with his sisters' interests. The $32,280 note was not secured by mortgage on the property conveyed or otherwise, except a personal agreement that a certain proportion of the income derived from the property should be applied towards its payment; it was only the personal note of Byrd and wife. It was the title he obtained of that three-fifths interest which was the foundation of this purchase of the whole property at the aggregate price of $53,800. If Byrd had come as a stranger into the market to purchase, with no favors to be granted him, it is altogether improbable that he could have made that purchase. There was evidence of a very satisfactory character tending to show that Carter paid the purchase money for the interests of William and the widow and heir of George, and that he paid the $15,000 mortgage that Byrd had put on the land. There was also evidence of the notary who wrote the deeds that about the same time that Carter executed the deed conveying the three-fifths to Byrd the latter executed a deed to Carter conveying all the land to him, but defendants denied that.

Our conclusion from the evidence is that Byrd has not sustained his plea of innocent purchaser for value.

III. It is claimed by defendants that the plaintiff has been guilty of laches. The deed was obtained from her in December, 1904; this suit was begun in May,

1908, therefore not barred by the Statute of Limitations. Laches is an equitable defense, it is allowed sometimes when the period of limitation prescribed by the statute has not elapsed; but it is never allowed unless the delay has produced such a change in conditions that the defendant is put at disadvantage, and not always then. The delay in this case has worked no injury to the defendants, they were as well equipped to make their defense at the trial as they would have been at any time before. But it is said that mining leases to third parties have been made and their interests would be jeopardized. The interests of those parties are not in question in this suit, and what is here adjudged is not *res adjudicata* as to them. If this plaintiff should hereafter dispute the validity of the mining leases, as they affect her one-fifth interest, the courts will be free to hear what the lessees have to say on that subject. So far as those leases may involve the defendants in controversies, the plaintiff is not responsible. It is certainly no answer to a charge of obtaining property by fraud that the defendants have made such a disposition of it that it would embarrass them to be required to make restitution.

There is another answer to this plea of laches. The conduct of defendant Carter was such as to allay suspicion.

In January, 1906, defendant Carter wrote the plaintiff about the suit Laura had brought against him, complaining bitterly of its injustice, and, attributing it to the influence of lawyers, asking her to try and recall everything that she had ever heard Laura's husband say in reference to the value of the property and the mining shafts that were there in 1897. It was a letter full of expressions of affection for Laura and regret that she had fallen into the hands of the "gang of lawyers" which would result in her financial ruin. Plaintiff answered the letter assuring him of her sympathy and assistance. Those letters show the confi-

dence the plaintiff still reposed in her brother; she was ready to take sides with him against her sister, whose hospitality she had enjoyed and with whom she had made her home before her marriage, not perhaps because of lack of affection for her sister, but because of the representations contained in the letter of her brother to the effect that Laura had been imposed on by the lawyers who advised the lawsuit. That suit, as has already been said, was compromised by paying Laura a sum equivalent to that paid William. January 14, 1908, plaintiff wrote her brother a long and affectionate letter in which she said: "My dear Brother: I received your ever welcome letter sometime ago but owing to its being so near Xmas times I hadn't time to answer. I was indeed glad to know how you feel regarding the old home place and hope you may get great returns sometime in the near future. I have and always have had unbounded faith in the integrity of my brothers and what they say they always do." Up to that date, as all the letters show, the plaintiff had absolute confidence in her brother, the defendant Carter, and he conducted himself towards her as if he entertained for her the most genuine affection. But in January, 1908, after she had written the above letter, the plaintiff was informed by a letter from her brother William that their nephew George had brought suit against these defendants which had come to trial in January, 1908, and the report of the trial conveyed to the plaintiff the first information that led her to believe that she had been imposed on. William enclosed in his letter a clipping from a newspaper giving an account of the trial. After that she lost no time in bringing suit. Of course what William said in the letter and what was said in the clipping from the newspaper were not evidence of the truth of what was said, but it was evidence in connection with her testimony as to when she received the first information.

The defense of laches is not sustained.

IV.   There was an accounting covered by the decree including rents and profits.   Appellants complain that they should have been allowed certain items and should not have been charged with certain other items.

a.   It is claimed that Byrd should have been credited with the value of his services in improving and developing the property.   It was shown that the property had advanced in value after the defendants had obtained the deed from plaintiff, but that increase in value was owing chiefly, if not entirely, to the development of its minerals through the operation of the mines and that was the work of the lessees holding mining leases.   It was doubtless true that the leases were made through the activity of the defendants, but it would have been mere conjecture if the court had undertaken to estimate the value of Byrd's services based on the increased value of the property.   Besides, what he did was in his own interest or that of his father-in-law, and they were in possession of the plaintiff's property in their own wrong.   It was not error not to allow that item.

b.   Byrd obtained a judgment against the Webb City Bank for $10,469.92, for a bonus on a lease of the premises, and the court decreed that plaintiff was entitled to one-tenth of that judgment when collected less costs and expenses for attorney's fees.   We find no error in that.

c.   The court found that defendants had received from minerals taken from the land of plaintiff the sum of $2212.85, which sum she was entitled to deduct from the $5000 paid her as purchase money which she had tendered back in her petition.   But the court did not allow defendants interest on that $5000, as it should have done, from the date of the payment to her to the date of filing the suit.   The exact date when the $5000 was paid does not appear; the deed from plaintiff to Carter is dated December 9, 1905, it was recorded February 5, 1906, perhaps it would not be far wrong to take Jan-

uary 1st, 1906, as near the date of payment of the money, which would give as an approximate of the period on which interest should be allowed, two years and four months, amounting to $700. That amount should be added to the $5000, making $5700, from which deducting $2212.85 leaves $3487.15, the amount to be paid by plaintiff on the fulfillment of the decree. That is the only error we find in the record. For that error the judgment will be reversed and the cause remanded with directions to the circuit court to enter a decree in all things the same as the decree rendered August 6, 1908, except to add $700 as interest to the $5000, from which the $2212.85 is to be deducted, leaving the amount to be paid by plaintiff to defendants on the fulfillment of the decree on their part, $3487.15; the decree to be entered as of date August 6, 1908. All concur.