W. L. CARTER and BELLE CARTER, Appellants,
v. S. E. CARTER and CHAS. A. BYRD.

Division Two, May 26, 1914.

SUIT TO CANCEL DEED: Fraud: Fiduciary Relation: Mining
Lands. Evidence in a suit to cancel a deed *held* not to show
fraud in the grantee, who was the agent and fiduciary of
the grantor, in procuring such conveyance, including lands
which afterward grew in value from discoveries of mineral.

Appeal from Jasper Circuit Court.—*Hon. D. E. Blair.*
Judge.

AFFIRMED.

*H. W. Currey* for appellants; *W. J. Owen* and
*George V. Farris* of counsel.

*George Hubbert, Frank L. Forlow* and *Howard
Gray* for respondents.

ROY, C.—This is a proceeding to cancel a deed
on the ground of an alleged fraud of the grantee in
procuring it. There was a decree for the defendants,
and plaintiffs have appealed.

Washington Carter died intestate in 1874, own-
ing 538 acres of land northwest of and adjoining Webb
City. He left a widow who died in 1887. His son
George died about 1882 intestate and without ever
having been married. Another son, A. G. Carter, died
in 1903, leaving a widow Harriet and a minor son,
George. The surviving children of Washington Car-
ter are the defendant S. Elmore Carter, the plaintiff
Wm. L. Carter, Mary Leslie and Laura Miller. The
plaintiffs are husband and wife, the wife having no
interest in the property except her inchoate right of
dower. Defendant Byrd is the son-in-law of his co-

defendant. Where not otherwise indicated, we shall hereafter speak of Wm. L. Carter as the plaintiff and of S. E. Carter as the defendant, as the controversy herein in mainly between those two.

S. E. Carter was fifty-four years old at the time of the trial in 1909; the plaintiff was forty-one. The plaintiff lived on the land in controversy from his birth until about 1896. He was married in 1890, and from that time had charge of the farm, cultivating it and paying rent to the other heirs. In 1896 he moved to another farm several miles distant and in 1898 bought a farm in McDonald county, on which he lived until after the transaction in controversy. Mining for lead and zinc on the Carter land began about 1887. In 1890 the defendant and his brother A. G. Carter took a mining lease on the land from the other heirs. They subleased various portions of it; and mining operations were carried on in an intermittent way until the time of the making of the deed in controversy. Prior to the making of that deed some very valuable mines were opened on the land adjoining the Carter land on the east and south. After the death of A. G. Carter, the defendant had charge of the land as the agent and representative of the other heirs and as lessee under the mining lease.

On November 30, 1904, the plaintiffs signed and acknowledged a deed which purported to convey the undivided fifth of the land to defendant C. A. Byrd for the expressed consideration of $10,760. That deed was not then delivered, but was in escrow in a bank in Webb City, to be delivered upon the payment of the consideration named. The circumstances under which that deed was placed in escrow were as follows: Defendant represented to the plaintiff that he was negotiating for the sale of the land at one hundred dollars an acre, and that he was anxious to sell at that price, stating that he wanted the other heirs to put their deeds in escrow in the bank so the deal could

be closed when the parties were ready. The envelope enclosing that deed had the following indorsement:

"November 30, 1904.

"The enclosed deed from me to Chas. A. Byrd may be delivered to him upon payment to Webb City Bank, of Webb City, Mo., for me, on or before one year from the date hereof of the sum of ten thousand seven hundred and sixty dollars ($10,760), otherwise to be returned to me.

"W. L. Carter, Neosho, Mo., Route 3."

After the expiration of the year, the deal not having been closed, on the request of the plaintiff, the bank returned the deed to him. Sometime in January, 1906, the defendant visited the plaintiff at his home in McDonald county. Plaintiff and defendant went to Neosho together; and while at that place the following so-called option was executed:

"This agreement made and entered into by and between S. E. Carter and W. L. Carter that in consideration of one dollar and other valuable consideration do hereby agree that if S. E. Carter pays to W. L. Carter $8000 and deeds to him his 35/96/100 acres of land west of Waco, Jasper county, Mo., that W. L. Carter will deed to S. E. Carter upon request all of his undivided one fifth interest in 538 of land about two miles west of Webb City, Mo., in section 1 and 12 Jasper county, Mo., on or before the first day of May, 1906.

"S. E. Carter.
"W. L. Carter."

That tract of land west of Waco will hereafter be called the Waco land. It had belonged to S. E. Carter and A. G. Carter. The latter had conveyed his half in 1903 to the former for $600.

About February 9, 1906, plaintiff took the deed that had been previously signed by him and his wife to Webb City. S. E. Carter assigned his option to his

co-defendant Byrd on February 8, 1906, and on February 9 he and his wife executed a deed for the Waco land called for in the option and placed it in escrow in the bank. Sometime in April thereafter the deal was closed by the payment of $8000 to the plaintiff and by the delivery to him of the deed for the Waco land and by the delivery of the deed from the plaintiffs to Byrd.

The petition alleges that the defendant had charge of the land, collecting rents, paying taxes, and remitting to the heirs the net amounts due them respectively. That the defendant had superior knowledge of mining land and that the plaintiff had no knowledge of the value of lands for mining purposes. That zinc ore had been discovered at different places on the Carter land of such richness as to make it very valuable. That the defendant knew of such facts and that the plaintiff did not. That the plaintiff relied on the defendant's judgment and honesty.

The fraudulent statements alleged to have been made by defendant are as follows: that the land was of little value; that the mineral developments on the Carter land and on the adjoining land did not amount to anything; that the rains and floods destroyed the agricultural value of the land; that the defendant wanted to sell his interest in the land at the rate of one hundred dollars an acre, making one-fifth thereof amount to $10,760; that if plaintiff did not sell, he, defendant, would proceed to partition the land, and that the purpose of putting the deeds in escrow in the bank in the name of Byrd was for the purpose of having Byrd make a deed to the purchaser when the deal was closed, and that $8000 and the Waco land was all he could afford to give for plaintiff's interest.

The petition also alleged that at the time the deed was delivered, the defendant had given options on the land at the rate of $300 or $400 an acre.

The petition alleges that said representations were false and known to be false by the defendant and that plaintiff did not know of such falsity. The answer put those allegations in issue.

In July, 1905, defendant purchased the interest of his sister, Laura Miller, in the land for $3500. Shortly after that purchase, Mrs. Miller sued him for the purpose of canceling that deed in the Federal court at Joplin. In May, 1906, he compromised with her by paying her an additional sum of $8760. About December 9, 1905, he purchased the interest of his sister, Mrs. Leslie, who lived in Alaska, for five thousand dollars. She sued to cancel that deal, resulting in a decree in her favor, affirmed by this court in the 240 Mo. 552.

In February, 1906, at about the same time with the closing of the deal with plaintiffs, Byrd purchased the interest of the widow and minor heir of A. G. Carter, for $10,760, paying one half to each. The deed from the curatrix of the minor heir was declared void by this court in Carter v. Carter, 237 Mo. 624. The defendant soon after his marriage in 1876 moved to a farm of his own about six miles from Webb City and remained there until 1902, when he moved to Webb City. He was to some extent interested in mining, and the evidence indicates that he had prospered in that business.

The following letter was put in evidence by the plaintiffs:

"Webb City, Mo., December 21, 1905.

"W. L. Carter, Neosho, Mo. Dear Brother: I was expecting you to come up last monday or tuesday I thought you would likely go with some of the boys to the Pandhandal Country I have tryed to arrange to go my self but the Litigations that we have gotten into in the Monticello mine and the Miller Litigation has detained me thus far but I hope to make this trip in the near future. William I have some parties that say that

they will Lease some of the old home plase if they can get a Lease for 15 years they think 10 years not long enough if I can induce them to do this would you join me in making this lease and you get the same Royalty as I do after the lease I hold from you expires I believe this would induce them to go on the land you see I have a lease from Betty and george for a longer period than from you and have bought Maryes interest in the old home farm and you are the only one that I would have to consult in this matter of a longer time and i think it would be a great inducement to get operators on our ground we will have to do something to keep them interested the Rosin jack mill shut down in a day or to after you was hear and is still down and the parties that work thare say the ore baring ground is not over 18 in thick this loks very bad to see a mill like that on a property standing idle I have succeeded in getting another mill started. I do not know what this will amount to I hope it will succeed better than the others. I do hope that some of them at lease will find a mine that will make them money for if they can find a good mine it would change the cituation some what in our favor I have fears that the ozark Co will not last very long the big pump is not yet put in and I have ben informed that they like the necessary fundes to go ahead as they should and this is why i do not think it advisable to let any chance slip.

"Yours truly,      S. E. CARTER."

The plaintiff testified that the defendant told him prior to making the option that Mrs. Miller had sued him claiming that he had beat her out of her interest in the land.

Plaintiff's wife and son testified that when he got back from the trip to Neosho at the time the option was made with the defendant the plaintiff was drunk. Plaintiff testified that defendant had a quart bottle of whiskey on that occasion and that they both drank

out of it. But he further testified that plaintiff first
offered him $5000, then $6000, which plaintiff refused,
and that defendant then offered .$8000 and the Waco
land, which he accepted. He further stated that. he
wrote a copy of the option at the time and signed
and delivered it to the defendant. He also testified
that when he made that option he exercised his own
judgment. In his testimony in regard to the mining
that had been done on the Carter land prior to clos-
ing the deal in controversy, the following occurred:

"Q. When you delivered these deeds and options
you knew these companies had all gone and  moved
their mills off, you knew that? A. Yes, sir."

Plats were put in evidence showing that Center
Creek runs in a serpentine course through the land
and that there are several sloughs and much over-
flowed land, and that several branches run into the
creek through the farm. As near as can be gathered
from the evidence the rents of the land for agricultural
purposes were three hundred dollars a year or a little
more.

During the Christmas holidays, 1905, plaintiff
made a trip to Texas. Mr. J. B. Davis was with plain-
tiff on that trip and was a witness for plaintiff. On
cross-examination he stated that while on the trip he
told plaintiff of the sale of the Lee eighty acres a quar-
ter of a mile south of the Carter land for about $23,000,
and of the Wilson land adjoining the Carter land on
the south at $1000 an acre, and also told him that he
(witness) had been offered $200 an acre for his land
close by. Plaintiff was afterward placed on the stand
when the following occurred on direct examination:

"Q. Before I forget it, there was something said
here—You heard the testimony of Mr. Davis—you
heard the testimony of Bert Davis as to a conversation
between you and him respecting land values? A. Yes,
sir.

"Q. And he told you something about some land values? A. Yes, he told me about his land; what he was offered for it.

"Q. Is that a fact he told you about that? A. Yes, sir. We was driving along—I was with Elmore after that and we was driving along and talking about this land, S. E. Carter and me, lands around there and the value of it, and I says to S. E. Carter, 'Mr. Davis tells me he was offered two hundred dollars an acre for his land.' He says: 'He was never offered anything like that.' It was high over on the side of the hill and you could see the drill cuttings from the buggy and he says, 'They never struck a thing, never got anything at all,' but I found out afterwards they did strike big stuff there.

"Q. You found out since they had stuff? A. Yes, sir. That is on the Davis farm."

On cross-examination he stated that the conversation with S. E. Carter occurred in 1905, then the following occurred:

"Q. You say in 1905 you could see the drill running on what land? A. I said the drill cuttings.

"Q. The drill cuttings on what land in 1905? A. Bert Davis's land.

"Q. When did you go down to Texas with Bert Davis? A. Some time in the wintertime.

"Q. What year? A. Must have been 1905.

"Q. Then how did you get out with your brother early in 1905 telling what Davis said when Davis said this all took place in December. How did you get out here in 1905 with your brother before that? A. I might have made a small mistake.

"Q. Pretty big one, wasn't it? A. I thought it was in the fall, but still it might have been later."

In the litigation with Mrs. Miller, Judge Robertson represented the defendant, and Thomas Dolan represented Mrs. Miller. The defendant, before the settlement of that litigation in May, 1906, through Judge

Robertson made an offer to Mr. John Dolan, the son of Thomas Dolan, to sell the Carter land at a hundred dollars an acre with an addition of about $7000 which was to go to other persons as commissions, about $2000 of which was to go to Judge Robertson. That proposition was pending a week or two and was not accepted.

On February 19, just ten days after plaintiff put his deed in the bank with the option, Byrd gave an option on the land to John Carey at $304,000. Carey never at any time called for the land under that option. The evidence showed that Byrd collected royalties as follows: -for 1906, $4588.92; 1907, $14,331,27; 1908, $4975.99; 1909, $6107.26; total $30,003.44.

There is no evidence in the case tending to show that any statement of fact, as distinguished from matter of intention or opinion, made by the defendant, was false. After executing the option to the defendant in January, 1906, and prior to closing the deal in April, the plaintiff spent several days examining and pricing lands around Webb City with a view to buying with the money he was to get for his interest in the Carter land; and he finally bought a farm in another neighborhood.

The evidence for the plaintiff tended to show that the land in the beginning of the year 1906 was worth from $150 to $400 an acre. The evidence for the defendant was that the land was worth about $100 an acre.

The result of the litigation in the Miller and Leslie cases shows conclusively that the defendant was guilty of fraud in those deals, and that too with his sisters who were far away and relying upon him to treat them fairly. With those facts before us we have been forewarned to be on the lookout for fraud in this case. We have not been able to find it. We concede without expressly so holding that the relations of the plaintiff and defendant were such as to consti-

**Fraud: Fiduciary Relation: Mining Lands: Evidence.**

tute defendant the agent and fiduciary of plaintiff so as to throw the burden upon defendant of showing that the plaintiff was fairly dealt with.

It is charged that the defendant stated to plaintiff that the rains and floods had destroyed the agricultural value of the land. The facts are that plaintiff lived on the land all his life until 1896, and testified that the floods partly destroyed his wheat. The defendant had not lived on the land since about 1876. Plaintiff had more knowledge of the merits of the land as a farm than defendant had.

The petition alleges fraud in inducing plaintiff to put the deed in bank in escrow in November, 1904. Yet it is a conceded fact that the deed remained there a year, and was then returned to plaintiff at his request. Defendant could not have been very anxious to close that deal. All he had to do was to pay the amount named in the deed and have the deed delivered to Byrd.

The letter of December 21, 1905, from defendant to plaintiff, so far as we have been able to discover, was a fair statement of the facts as they existed at that time. Defendant wanted plaintiff to make a lease of the land, the plaintiff to get the same terms as the defendant after the expiration of defendant's lease. In that letter the defendant stated that he had succeeded in getting another mill started on the land, and said "if they can find a good mine it would change the situation somewhat in our favor."

Plaintiff testified that at the time he closed the deal all of the mills that had formerly worked on the Carter land had left.

We have been much impressed with the fact that plaintiff admitted that Davis, on their trip to Texas during Christmas, 1905, told him about the sale of land adjoining the Carter land, some at $300 and some at $1000 an acre, and that he (Davis) had been offered $200 an acre for his. Yet plaintiff attempted to avoid the force of that evidence by saying that when he was

on the land with defendant in 1905 he told defendant about what Davis had said, and that defendant said, "He was never offered anything like that. They never struck a thing, never got anything at all." On cross-examination, he was constrained to admit that he was not on the land with defendant in 1905 after his trip to Texas, and that he had made a mistake. One who assails another on a charge of fraud should be sure that his own evidence is free from suspicion of an attempt to impose on the court. The defendant, before closing the deal with plaintiff, told the plaintiff that their sister, Mrs. Miller, had sued him for fraud in his purchase from her. During that Miller litigation defendant offered to let Mr. Dolan have the land for a sum that should net $100 an acre. That proposition was pending a week or more and was not accepted. Defendant paid his brother $600 for a half interest in the Waco land in 1903. That would be $1200 for the tract. That amount plus the $8000 cash was $9200 paid plaintiff for his interest in the land. That lacks only $1560 of the original consideration named in the deed, the amount for which defendant was willing to let Mr. Dolan have the land.

The evidence shows that the plaintiff was fully aware of the productiveness of the mines on land adjoining the Carter land. He well knew the failure of the mining operations on the Carter land up to the time of the deal in controversy. After the deed was put back in the bank, it remained there about two months before it was delivered. If the defendant was anxious to seize the land at less than its value, why should he delay so long?

Plaintiff introduced evidence tending to show that defendant got him intoxicated in order to defraud him. He had two months in which to get sober before he caused his deed to be delivered. It is true that after defendants purchased the lands, some productive mines

were opened on the land, but they are clearly shown to be discoveries made after the conveyance by plaintiff. Before the plaintiff closed the deal with the defendants he investigated the question of land values with a view to buying land near Webb City. He purchased elsewhere. We have chosen to treat the defendants as one and the same person so far as the merits of this case are concerned. But we hold that the evidence clearly shows that defendant's dealing with his brother, the plaintiff, was free from fraud of any kind, and, consequently, the decree of the court below is affirmed. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.