HERBERT V. JONES, JR., et al., Trustees Under Trust Agreement with FIDELITY NATIONAL BANK AND TRUST COMPANY OF KANSAS CITY, Respondent, v. FIDELITY NATIONAL BANK AND TRUST COMPANY OF KANSAS CITY, a National Banking Association, et al., Defendants,
and (109,984)
J. E. TAYLOR, Attorney General of the State of Missouri, Defendant-Intervener, Appellant,

Consolidated with

HERBERT V. JONES, JR., et al., Trustees Under Trust Agreement with FIDELITY SAVINGS TRUST COMPANY, Plaintiffs, Respondents, v. FIDELITY SAVINGS TRUST COMPANY, a Missouri Corporation, et al., Defendants,
and (110,211)
J. E. TAYLOR, Attorney General of the State of Missouri, Defendant-Intervener, Appellant, No. 42082—243 S. W. (2d) 970.

Court en Banc, November 12, 1951.

Rehearing Denied, December 10, 1951.

*J. E. Taylor*, Attorney General, and *Julian L. O'Malley*, Assistant Attorney General, for appellant.

714

*Justin D. Bowersock, Richard S. Righter* and *Robert D. Youle* for respondent trustees.

716

718

*George J. Winger* for defendant-respondents.

TIPTON, J.—This case comes to the writer on reassignment. It originated in Division Two of this Court, where an opinion was prepared by the Honorable Lawrence Holman, judge of the Ninth Judicial Circuit, sitting as a special judge in that division. The case was transferred to the Court en Banc where it was again argued and reassigned. Portions of the opinion prepared in Division Two will be adopted by the Court en Banc.

"This is a consolidated appeal from decrees in two companion cases instituted in the Circuit Court of Jackson County by respondent trustees seeking equitable and declaratory relief. The Attorney General was permitted to intervene as a defendant and from decrees adverse to his contentions he is the sole appellant. We have jurisdiction since the Attorney General, a state officer, is a party.

"There is no dispute about the facts, but we deem it advisable to state the same in some detail in order to properly determine the issues raised. On March 3, 1933, the Fidelity National Bank and Trust Company of Kansas City, a national banking association, hereafter referred to as the National Bank, and the Fidelity Savings Trust Company, a Missouri Corporation, hereafter referred to as the State Bank, were closed because of financial difficulties and shortly thereafter reopened upon a restricted basis, the National Bank being under the control of a federal conservator and the State Bank under the control of a special deputy commissioner of finance. All of the stock of the State Bank was owned by the National Bank or its officers. Parties interested immediately began efforts to negotiate a reorganization of the banks which culminated on July 22, 1933. The plan of reorganization of the National Bank was approved by the Comptroller of the Currency and made possible by the written consent of creditors representing more than 75 per cent in amount of the deposits and other liabilities, which under the law bound all of the creditors. Title 12, par. 207, U. S. C. A. On behalf of the State Bank the plan was approved by the Commissioner of Finance and made possible by the signing of a written consent and waivers by creditors representing more than 85 per cent in amount of total deposits, which under the emergency act that became effective February 22, 1933, now Section 362.505, RSMo 1949, bound all of the creditors. Under the plan 62 per cent of the most desirable assets of the National Bank were taken over by a new bank, the Union National Bank in Kansas City, which bank in consideration therefor assumed liability for the immediate payment of 62 per cent of the deposits. The new bank took over 52-1/2 per cent of the assets of the State Bank and assumed liability for a like amount of the deposits. Trust indentures were entered into as a part of the plan between the banks

and Herbert V. Jones, Howard McCutcheon and Harry E. Minty, as trustees, to liquidate the remaining assets of the bank for the benefit of the creditors. The creditors of the National Bank executed waivers by which they assigned 38 per cent of their deposit claims to the trustees, which claims were assigned by the trustees to the bank in return for 38 per cent of the non-liquid and depreciated assets. The amount of the deposit claims assigned by the State Bank creditors was 47-1/2 per cent, which were used by the Trustees in the same manner. The assets conveyed to the trustees in the National Bank Trust were subject to the payment of loans due the Union National Bank, First National Bank of Kansas City, the Federal Reserve Bank, and the Reconstruction Finance Corporation, which totaled $5,652,087 and which had to be paid before there could be any distribution to the beneficiaries of the trust. The assets conveyed to the trustees in the State Bank trust were subject to similar loans totaling approximately $3,000,000. The National Bank retained a fund of approximately $800,000, referred to as an undisclosed liability fund, with which to pay certain anticipated claims, the number and amounts of which were unknown at that time, and before final liquidation it was to pay any portion remaining of this fund to the trustees. With this exception, all assets were transferred on July 22, 1933, and both the State and National Banks were restored to solvency, as they had no assets and no liabilities, and the officials of the state and federal government released them from supervision.

"The largest single asset acquired by the trustees was the Fidelity Building. The trustees accepted the assets transferred to them and under the trust indentures were to hold and liquidate the same and after payment of the bank loans heretofore mentioned were to distribute the proceeds to the creditors. If the funds received from liquidation proved adequate the beneficiaries of the National Bank trust were to receive an amount equal to the remaining 38 per cent of their deposit claims, together with 2 per cent interest thereon and the State Bank trust beneficiaries an amount equal to the remaining 47-1/2 per cent of their deposits with like interest. As required by the indentures the trustees issued participation certificates representing the proportionate interest of each creditor in the trusteed assets, but many of these were never delivered and the trustees have not been able to pay one or more dividends to the holders of many of the certificates. The trustees undertook to carry out their duties under the agreements and conducted a gradual liquidation of the assets and at the time of instituting these suits the liquidation had been completed. Due to the appreciation of real estate values they were able to sell ▮▮▮ the Fidelity Building in 1947 for almost $2,000,000 more than the mortgage thereon.

"Howard McCutcheon, an original trustee, died in 1942, and respondent, Dorman H. O'Leary, was appointed trustee in his

place in January, 1944, by the remaining trustees pursuant to the powers in the trust agreement. Herbert V. Jones died in August, 1949, and was likewise replaced shortly thereafter by Herbert V. Jones, Jr. Both the trust agreements and the waivers signed by creditors provided that the trustees should make no charge for their services, but were entitled to employ such agents and attorneys as reasonably necessary to effect such liquidation. In the National Bank trust, after paying the prior loans the trustees have declared 10 dividends to certificate holders representing the face amount in full of their certificates. In the Savings Bank trust seven liquidating dividends have been declared, which total 65 per cent of the face of the certificates. When the suits were filed the trustees had on hand approximately $560,000 in the National Bank Trust, which was sufficient to pay part, but not all of the interest provided for. In the State Bank trust they had on hand over $300,000, which they estimated would pay an additional 15 per cent on the face of the certificates, but that no interest would be paid to the beneficiaries of said trust.

"Both suits filed herein are class actions, in which representatives of four classes of defendants are made parties. These are: (1) certificate holders, who were personally served, and have received all of the liquidating dividends declared by the trustees; (2) certificate holders, served by publication, who have not received one or more of the liquidating dividends; (3) beneficiaries to whom the trustees have not been able to deliver certificates. These were served by publication; (4) stockholders of the respective banks. Personal service was had on the representatives of this class of defendants. Pursuant to Supreme Court rule 3.07(c) the trial court, upon motion of respondents, appointed George J. Winger as attorney for the first class of defendants, J. M. Fisher as attorney for the defendants of the second class, and Raymond G. Barnett as attorney for the defendants of the third class.

"In their pleadings the respondent trustees sought an adjudication as to their right to compensation by reason of the extraordinary services they alleged they had performed; attorneys' fees for their attorneys in this action; the determination of the rights of the persons who have not been located, and to whom some or all of the dividends have not been paid; and that the court approve their final accounting and direct the final distribution of assets to certificate holders and creditors. All of the attorneys appointed by the court filed appropriate answers. The Attorney General, upon his petition, was permitted to intervene as a defendant and filed answers in which he denied that the trustees were entitled to compensation and alleged that upon final settlement all unpaid dividends in the hands of the trustees should escheat to the state either under the escheat statutes of Missouri, or the Common-Law Doctrine of bona vacantia.

In the State Bank case he interposed a further alternative plea that the unpaid dividends be delivered to the Commissioner of Finance under the appropriate statute.

"The cases were tried and the court in the National Bank case found that the plaintiffs had faithfully administered their trust, the assets had been properly liquidated, and the trustees were entitled to a settlement of their accounts; that the class three defendants, who had never received their certificates, were guilty of laches and were estopped to claim any part of the funds in the hands of the trustees. The decree further found that the trustees have performed extraordinary services and allowed them a joint fee of $125,000. The trustees' attorneys were allowed a joint fee of $50,000. Each of the attorneys appointed by the court was allowed $2,000 for his services. A disbursing agent was appointed by the court, who, after giving the required bond, was directed to receive the assets from the trustees and distribute said funds to the creditors. The court reserved jurisdiction with respect to the disposition of any funds remaining after the ▮▮▮ distribution was completed. The court denied the relief prayed for by the Attorney General in his answer. The decree in the Savings Bank case is in substance identical with that in the National Bank case except that no fees were allowed in that case. Other facts will appear in the course of the opinion.

▮ "We should first determine the legal status of the estates created by the trust agreements. Both Federal and State laws provide for an orderly liquidation of insolvent banks and the distribution of their assets to creditors. But this was a liquidation of a portion of the assets formerly owned by the banks under a reorganization plan approved by the depositors and the proper supervising officials. When the plan became effective both trust companies ceased operation, had no assets, and no liabilities. The assets transferred to the trustees were to be liquidated for the benefit of creditors, as provided in the trust instruments. It was not a bank liquidation as contemplated by State and Federal laws and we hold that none of these laws were applicable to the management of either trust or the distribution of the funds to beneficiaries. The instruments simply created trust estates governed by the general law of this state applicable thereto."

▮ Respondents have filed a motion to dismiss the appeals in both cases because the appellant, the attorney general, was not aggrieved by the decrees and, therefore, has no appealable interest. Section 512.020, RSMo 1949, provides that "any party to a suit aggrieved by any judgment of any trial court in any civil cause" may appeal from any final judgment. The appellant was granted permission to intervene in this cause by the trial court and he may plead any issues that are adverse to either the original plaintiff or defendant or both of them. Young v. Pressgrove, 355 Mo. 204, 195 S. W. 2d 516.

■ To decide this motion it is necessary for us to look at the issues made in this case. The appellant in his intervening petition states that ''the waivers and transfers executed by the said depositors and creditors which gave life to the Trust Agreement, amounted in law to an assignment for the benefit of said depositors and creditors of said bank, and upon final accounting and settlement of the trustees under the Trust Agreement, all funds remaining in the hands of said trustees, belonging to and unclaimed by depositors who were entitled to receive, or who did receive, participating trust certificates under the terms of the Trust Agreement, should be construed as unclaimed dividends in the hands of said trustees, and which are subject to the general escheat law of the State of Missouri,'' found in Chapter 470, RSMo 1949.

Are the respondents assignees for the benefit of the depositors within the meaning of section 470.010?

''Section 470.010, RSMo 1949, provides that unclaimed dividends in the possession of an assignee for the benefit of creditors upon final settlement shall escheat to the state. Respondent trustees contend this statute has no application to the unclaimed funds in their possession because the transfer of the assets to them was not an assignment for the benefit of creditors as that phrase is used in the escheat law. True, this was not a statutory assignment governed by the provisions of Chapter 426, RSMo 1949. But common law assignments were recognized long before any such statutes were enacted. In 6 C. J. S. par. 1, page 1220, the phrase 'assignment for the benefit of creditors' is defined as follows: 'Voluntary assignments for the benefit of creditors are transfers, without compulsion of law, by debtors, of some or all of their property to an assignee or assignees, in trust, to apply the same, or the proceeds thereof, to the payment of some or all of their debts, and to return the surplus, if any, to the debtor.' All of the elements embraced by this definition exist in the trust agreements here under consideration. The trust companies assigned the assets to the trustees to be held and liquidated for the benefit of depositors and other creditors and if they were paid in full the surplus was to be returned to their stockholders. No doubt it was provided that the reversion be to the stockholders rather than the corporations because it was ■ thought likely that the corporations would be dissolved before the assets were completely liquidated. In the trust instruments the assignees were referred to as trustees, but it should not be overlooked that every assignment for the benefit of creditors must be 'in trust.' The fact that we have statutes providing for assignments for the benefit of creditors does not prohibit common-law assignments as 'a majority of such statutes are construed merely to regulate the previously existing common-law right to assign and in so far as they authorize the making of an assignment, they are directory, rather than mandatory, and do not

provide an exclusive substitute for, nor abrogate the right to make a common-law assignment.' 6 C. J. S. par. 9, page 1229.

"We are not unmindful of Section 361.330, RSMo 1949, which prohibits a bank from making a general assignment for the benefit of creditors. This, no doubt, was enacted because the statute provides for the liquidation of state banks in Missouri by the Commissioner of Finance. Both trust instruments herein were part of a reorganization plan authorized by law, and approved by the creditors and the proper federal and state officials and would not come within the prohibition of the above section.

"Respondents strongly urge that the transfer of assets to the trustees was a sale and therefore could not be an assignment for the benefit of creditors. The trust instruments must be given a practical and common sense interpretation. It is true that the word 'purchase' is used to describe the transfer of the waiver of deposit claims from the trustees to the trust companies in exchange for the remaining assets of such companies, thus completing the plan of relieving the banks of liabilities as well as assets. However, it does not require the citation of authority to illustrate that this was not a sale as the term is generally understood, but was in fact a transfer of assets in trust for creditors with a reversion to the stockholders of the assignors after the creditors were paid in full. The provision for a reversion absolutely negatives the possibility of interpreting the transfer as a sale. The true nature of the transaction is described by the trust instruments in the following provision: 'Said Trustees shall receive and hold all the assets agreed to be transferred to them hereunder, in trust for the benefit of creditors of the Fidelity entitled to participate therein, to be liquidated by them and the proceeds distributed from time to time by said Trustees to said creditors upon their claims.' We rule this point against respondents."

Respondents contend that appellant was not aggrieved by the trial court's decree because under section 470.010 it is only the unclaimed dividends remaining in the hands of the assignees upon final settlement of the assignees for the benefit of the creditors that could escheat to the state, and under section 470.020 the assignees have one year after final settlement to pay "all moneys in his hands unpaid or unclaimed, as provided in section 470.010," to the state treasurer. In other words, it is respondents' contention that this appeal is premature for the reason that there has been no final settlement made by respondent trustees as required by section 470.010, and under section 470.020 these trustees would have one year after final settlement to pay the moneys into the state treasury before the court may order such payment.

These are suits in the nature of actions for declaratory judgments and are recognized as such by respondents as shown in the last paragraph of the prayer in both of respondents' petitions. Under our

declaratory judgment act, the findings and declarations of the trial court have "the force and effect of a final judgment or decree." Section 527.010, RSMo 1949. Under this section, the circuit courts have the power to declare the "rights, status, and other legal relations whether or not further relief is or could be claimed." The appellant's answer did not seek to escheat any of the funds in question; he merely sought a declaration of rights of all beneficiaries and of the state in order to protect the prospective interest of the state in the moneys so that at the appropriate time the unclaimed dividends will be paid over to the state treasurer. If the appellant is correct in his contention that the unclaimed dividends will eventually escheat to the state, then the state has suffered a pecuniary loss and, therefore, the appellant is aggrieved by the judgment or decree of the trial court. Of course, nobody would contend that an appellant must be able to reverse the judgment of the trial court on an appeal to the appellate court before an appellant could be aggrieved.

Under appellant's contention he would be further aggrieved by the decree allowing the trustees $125,000 as fees because such an allowance would diminish the funds that would escheat to the state.

 Respondents state that under section 470.030 the duty to collect funds that would escheat to the state is delegated only to the prosecuting attorney and, therefore, cast serious doubts upon the right of the attorney general to institute his intervention or to have any standing in court in these cases. Respondents evidently overlooked section 27.060, RSMo 1949, which provides in part that "the attorney general shall * * * on the behalf of the state, * * * enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court * * *; and he may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved." Surely, under this section the attorney general has the same rights as a prosecuting attorney.

 In paragraph 7 of the decree in the Fidelity National Bank case the court said, "The relief prayed for by the State of Missouri in its intervening petition is hereby denied; but the Court reserves jurisdiction with respect to the disposition of any funds remaining, after the distribution hereinafter ordered is completed."

Paragraph 8 of the decree states, "That this decree is a final decree with respect to paragraphs 1, 2, 3, 4, 5, 6 and the first part of paragraph 7 hereof."

Paragraph 5 of the decree held that those depositors to whom the trustees were unable to deliver certificates "are not entitled to any claim of any kind or character to any portion of the trust estate."

So it is plain to be seen that there is a final judgment that bars the appellant's claim that the funds of the depositors who did not receive certificates escheated to the state.

We therefore overrule respondent's motion to dismiss appellant's appeal.

"Appellant contends that it was error for the court to allow the trustees compensation for their services. It appears that the allowances were made in the National Bank case only because this trust required most of the work and had experienced a more favorable result. The trust agreement contained the following provision: 'The Trustees shall make no charge for their services, but they shall be entitled to employ such agents as may be reasonably necessary to effect such liquidation, and to deduct from the proceeds of liquidation the necessary out-of-pocket expenses and costs of collection, such as attorneys' fees, court costs, etc.' The identical provision is also contained in the waiver signed by the depositors wherein they assign 38 per cent of their claims to the trustees. It would appear upon the face of these instruments that it was a clear, binding agreement between the trustees and the National Bank, as well as the beneficiaries, that the trustees were to serve without compensation. The law does not forbid gratuitous services in fiduciary relations and the waiver of compensation is not against public policy. See In re Hayden's Estate, 16 N. Y. S. 2d 122, 172 Misc. 669. Respondents have advanced several theories which they say make this agreement to serve without compensation inapplicable under the facts here.

"First, they contend that they are entitled to compensation because their services exceeded in scope, volume and length of time what was contemplated by the parties at the time the agreements were entered into. The scope and volume of services required was apparent from the agreement and the bank records. It does appear that those promoting the reorganization plan told the original trustees that they anticipated that the liquidation could be completed in three or four years. If the trustees had desired they could have disposed of the assets and concluded their trust at any time after the Reconstruction Finance Corporation loan was paid off in 1936. It is commendable that they saw fit to voluntarily continue the trust until the sale price of their assets increased and until they sold the building in 1947, but is this a legal reason for departing from the terms of the contract? We think not. It was the voluntary act of the trustees with full understanding of the contract provisions now complained of. Respondents cite In re Barton's Estate, 214 Pacific 2d 857, in which the court granted relief from an agreement concerning the compensation of the trustee which was entered into upon a mutual mistake of an existing material fact which went to the essence of the contract, but the court further stated the following general rule: 'When the instrument by which a trust is created specifically fixes and determines the compensation of a trustee he is entitled to that and no more.' There was no mutual mistake as to existing facts when the trust instrument herein was entered into. The

reorganization leaders and the trustees simply made an inaccurate estimate as to the length of time required for full economic recovery in this country.

"What we have said above applies with equal force to the contention that they are entitled to be paid for services rendered in the management of the 'undisclosed liabilities fund,' which duties they urge were not contemplated by the trust instrument. It appears from the agreement that the primary duty of administering this fund remained with the National Bank and prior to final liquidation any amount remaining in it was to be paid to the trustees. Apparently the officers of the bank failed to perform this duty, at least to the satisfaction of the trustees, and the trustees accepted supervision of the fund almost from the beginning of liquidation. This does not justify the allowance of compensation. The trustees voluntarily assumed the administration of the fund, which only represented a small fraction of the total assets liquidated. Their only authority for handling the fund was the trust agreement, and in so doing they are bound by all its terms. The respondents cite Kaiser et al. v. Second National Bank of New Haven, 123 Conn. 248, 193 Atlantic 761, Bankers' Trust Company of Muskegon v. Forsyth, 266 Mich. 517, 254 N. W. 190, Dockins v. Vass, 124 S. W. 290 (Ky. Ct. App.), and Commerce Trust Company v. Aylward, 145 Federal 2d 113, in support of their contention. We have examined all of these cases but find that none of them are authority for the allowance of a fee to the trustees under the facts in this case.

"Two of the present trustees were appointed by remaining trustees to fill vacancies caused by the death of original trustees. The trust indentures so provide. They now contend that they are not bound by the provision to serve without compensation, as they never agreed to same. In support of this contention they cite Marshall v. St. Louis Union Trust Company, 209 Mo. App. 13, 236 S. W. 692. This case holds that a letter written by one trustee to the testator did not constitute a contract as to compensation, as it could not bind the co-trustee. The opinion does contain a statement of dictum that a successor trustee, *appointed by the Court,* might not be bound by an agreement between the testator and the original trustee as to compensation. That is not the situation here. If no successor trustee would have accepted election or appointment to the office under the terms of the instrument, a court of equity would have had authority to appoint one to complete the liquidation or preserve the assets and perhaps could have allowed him compensation. This is substantially what was done in the case of In re Rothenberg's Trust, 136 N. J. Equity, 530, 42 Atlantic 2d 767, cited by respondents. Here these respondents accepted the trusteeship to which they were appointed. Their only authority was the trust instrument. They could not accept this position of authority and responsibility under the instru-

728

ment and reject its terms as to compensation. Barry v. Barry, 198 Miss. 677, 21 So. 2d 922.

"Finally, they say that the trial court as a matter of law could allow compensation despite the provision in the trust agreement to the contrary, in order to prevent manifest injustice. No authority is cited to sustain this contention and we have been unable to find any. The record clearly shows that the respondents have rendered valuable services for the beneficiaries which, in some degree, were of benefit to the community in general. They did so knowing of the contract provision that they were not to be compensated. Many leading citizens take great pride in contributing a part of their time to the public service. Perhaps that was the commendable motive of these trustees. It should be here noted, however, that their services were not as extensive and onerous as might first appear. They employed agents and attorneys in adequate numbers and with the requisite skill to carry out the work of managing and liquidating these trust assets. The responsibility of the trustees was of a supervisory nature comparable to that of any board of directors of a bank or other business corporation. We find no principle of equity which would justify us, under the facts disclosed in the record, in disregarding the express agreement of the trustees to serve without compensation. It was therefore error for the decree to provide for the payment of compensation to the respondent trustees or to the personal representatives of deceased former trustees."

 The appellant assigns as error that portion of the trial court's decree that foreclosed the right of those depositors who had not received a certificate from the trustees to share in the distribution of the trust funds. That part of the decree reads as follows: "* * * members of said class have been guilty of laches and have abandoned their claims and right to receive trust certificates and their claims to the funds evidenced by the trust certificates prepared for them, and are estopped now to claim said certificates or to claim any portion of the funds to which they might otherwise be entitled, evidenced by said trust certificates."

This is not a statutory liquidation that has a special statute of limitations for the filing of claims. This is an express trust and the depositors are not required to file claims. The general statute of limitations is not applicable until the trust is repudiated by the trustees. Koppel v. Rowland, 319 Mo. 602, 4 S. W. 2d 816. It is the appellant's contention that there is no evidence in this record that would support the trial court's finding of laches.

" 'The doctrine of laches will prevent relief to one who has stood idly by with knowledge of his rights and allowed the situation to so change that it would be an injustice to others to grant the relief that was tardily sought.' Klebba v. Streumpf, 224 Mo. App. 193, 23 S. W. 2d 205, loc. cit. 207.

" 'The doctrine of laches is an equitable concept and finds its particular field of application in equity cases. But, whenever applied, the rule of action is founded on some change in the status of property or in the relation of the parties to each other which has operated to the disadvantage of one of the parties. As stated in Rollestone v. National Bank of Commerce, 299 Mo. 57, 76, 252 S. W. 394, 400: "Laches, in legal significance, is not mere delay, but delay that works to the disadvantage of another. It is not, like limitation, a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the conditions or relations of the property or the parties." ' State ex rel. Edwards v. Donovan et al., 226 Mo. App. 392, 41 S. W. 2d 842, loc. cit. 846.

" 'The generally accepted doctrine is that laches is not mere delay, but "delay that works a disadvantage to another." ' Collins v. Lindsay et al., Mo. Sup., 25 S. W. 2d 84, loc. cit. 89, and cases there cited. See also, Hagan et al. v. Lantry et al., 338 Mo. 161, 89 S. W. 2d 522, loc. cit. 529; Pryor v. Kopp, 342 Mo. 887, 119 S. W. 2d 228, loc. cit. 233." Ruckels v. Pryor, 351 Mo. 819, 174 S. W. 2d 185, l. c. 189.

This class of depositors did nothing to assert their claims from October 1933 to May 1950. This space of time far exceeds the statute of limitations. The expenses of liquidation were paid out of the funds in the hands of respondents. Every attempt possible to locate these depositors was made by these respondents; inquiries were made ▉▉▉▉ of the people who lived in the neighborhood of the last known address. On each of the series of liquidating dividends, a notice was sent to each depositor. The trust is ready to terminate. It would be a disadvantage to the other depositors to continue to expend the trust funds in an effort to locate the depositors and thus deplete the share the other depositors are entitled to receive.

Under the rule of law announced by Ruckels v. Pryor, supra, we are of the opinion that the trial court properly decided that these claims were barred by laches. We also hold that the evidence was sufficient to find that these deposits had been abandoned by these depositors. Of course, the action of the trial court in barring any rights of the depositors who did not receive a liquidating certificate would necessarily increase the dividends to certificate holders. We think the trial court properly barred this class of depositors to any claim to certificates or any claim to any portion of the trust funds.

▉▉ As previously stated, the appellant in his intervening petition contended that on final settlement all remaining funds in the trustees' hands "belonging to and unclaimed by depositors who were entitled to receive, or who did receive, participating trust certificates under the terms of the Trust Agreement" should escheat to the state. We have already shown that by that part of the trial court's decree which was final, the "relief prayed for by the State of Missouri in its inter-

vening petition is hereby denied.'' This decree, of course, would bar the state from claiming any unclaimed funds belonging to a certificate holder upon final settlement. The decree makes no provisions for such a contingency. Of course, this contingency might not arise, but one cannot read this record without coming to the conclusion that very few, if any, of that class of depositors who received certificates but have not received one or more of the liquidating dividends will ever be found to receive all the liquidating dividends due them. We have already ruled that the trustee agreement in this case is in fact an assignment for the benefit of creditors under section 470.010, supra. This section provides that ''if upon final settlement of an assignee for the benefit of creditors, there shall remain in his possession any unclaimed dividends,'' such dividends shall escheat and vest in the state. The facts before us come squarely within this section. It follows that if upon final settlement of these respondent trustees there remain in their possession any unclaimed dividends belonging to certificate holders, the same shall escheat to the state.

Since this is a declaratory judgment action, the court could have declared the right of the state to any funds of a certificate holder that remain unclaimed in the hands of respondents upon their final settlement, but he did not see fit to do so; yet, by a final decree he did foreclose the state to these funds. In that respect that was error. However, we do think the trial court in the exercise of his discretion had a right to reserve ''jurisdiction with respect to the disposition of any funds remaining, after the distribution hereinafter ordered is completed.''

We see no merit to the appellant's contention in the State Bank case that any unclaimed dividend should, on final settlement, be paid over to the commissioner of finance under section 361.200, RSMo 1949, for the reason that this is not a statutory liquidation.

The causes are reversed and remanded with directions to the trial court to set aside the decree heretofore rendered and to enter a decree in accordance with the views expressed in this opinion.

All concur except *Leedy, J.,* not sitting.