Lenah L. BLAKELEY, Appellant,

v.

Harold S. BRADLEY: Harold S. Bradley, Inc., a Corporation, and Vera J. Hanlon, Respondents.

No. 44519.

Supreme Court of Missouri.

Division No. 1.

July 11, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 12, 1955.

--------◆--------

W. Raleigh Gough and Claude McFarland, Kansas City, for appellant.

Stanley Garrity, Caldwell, Downing, Garrity & Eastin, Kansas City, for respondents Harold S. Bradley and Harold S. Bradley, Inc., a Corporation.

HYDE, Judge.

Action to rescind sale of land in Jackson County and to cancel the deed executed by plaintiff. The court denied rescission because of delay in attempting to rescind but found it inequitable for plaintiff's real estate agent to retain the commission of $265 paid for making the sale and entered judgment in favor of plaintiff for that amount against the corporate defendant, with costs taxed against all defendants. Plaintiff has appealed, claiming the entire transaction should be set aside.

Plaintiff's claim is that the real estate agent, employed by her, was the real purchaser and that the title was taken in the name of his employee's mother as a straw party for the benefit of the agent. The property involved is a 53 acre tract on the west side of U. S. Highway 71 south of Kansas City. The southern boundary of the City was then at 85th Street and this property is at 103rd Street. (Defendants' brief says the area has been annexed to Kansas City since the trial.) The contract of sale was dated July 22, 1944 and plaintiff's deed was delivered September 13, 1944. This action was commenced March 21, 1947. The court's decree states "that said attempted rescission was too long delayed; and that the purchaser equitably could not be placed in status quo; but the court finds it would not be equitable for defendant, Harold B. Bradley, Inc., to retain the Two Hundred Sixty-five Dollars * * * received as a commission for making the sale of said property." As hereinafter shown, regardless of whether the actual purchaser was the real estate agent, or his employee, defendant Vera J. Hanlon and her mother, if full and fair disclosure of the facts was not made to plaintiff (as the court must have found) then plaintiff was entitled to rescind if she acted in time. Clearly, the basis of the trial court's decision was not that plaintiff had no right to rescission but was instead that it was lost by unreasonable delay.

Plaintiff, who was 80 at the time of the trial in 1952, owned real estate both in Kansas City and in Jackson County outside the City. (This case was held under advisement until 1954.) Her husband, who was a real estate dealer, died in 1930. Their daughter was of unsound mind and was kept in an institution. Plaintiff owned a larger tract (107 acres) of which the 53 acres herein involved was a part, and had defendant Bradley sell the south 40 acres about two years before. Bradley lived in that part of the county and dealt mainly in county real estate. Bradley made a sale of the 40 acres for $4,500 to Wm. Dugan but plaintiff was not able to give a good title because of her daughter's condition. Plaintiff had her lawyers (including her lawyer in this case) bring a partition suit in which she purchased that 40 acres. Thereafter, in 1943, Bradley made a sale of the 40 acres to Mrs. Teefey for $4,750. (Plaintiff had paid Bradley a commission of $250 on the first sale which she could not complete.) Then plaintiff had her lawyers bring another partition suit, involving the remaining 67 acres of her land and some city properties, to get the title so that she could sell them. Bradley testified in that suit that the value of the 67 acres was $100 per acre and plaintiff purchased it for $6,700. Plaintiff sold about five acres of the northeast part to Mr. Rooney, who was operating a tavern and filling station on it. Plaintiff intended to retain the part of the tract on the east side of Highway 71 but wanted to sell the remaining 53 acres on the west side of the Highway and talked to Bradley about it. Plaintiff had an offer from Rooney of $150 per acre for ten acres adjoining his tract and an offer of $5,000 from Mr. Walter Page (another real estate dealer) for the whole 53 acres. In July 1954, at Bradley's office, she agreed to a price of $5,300; and signed a contract to sell it for that amount. There is a sharp conflict in the evidence as to what occurred in making that contract.

According to plaintiff, she talked to Bradley about dividing the land into smaller tracts and she had a survey made. He thought at first it might be done but later said it was not advisable because of the lay of the land. Thereafter, in his office, Bradley told her he had a buyer and handed her a contract all drawn up with the signature

"Mary C. Reese" on it. Plaintiff asked about selling part to Rooney but Bradley said Mrs. Reese wouldn't take any of it if she couldn't get it all. Plaintiff signed the contract and took a copy to her lawyers. When it was learned that the county would not build a road along the north side of the tract as expected (and stated in the contract) there were negotiations about an easement through the tavern property. This matter was finally settled by including in the deed a 30 foot strip for access to that part of the 53 acres. Plaintiff said she asked Bradley why she could not meet the buyer and he said she lived out of town; "but when she comes to town, he says, she stopped at the Rockhill Manor." Mrs. Reese, about 84 years of age at the time, was the mother of Mrs. Hanlon, who was employed in Bradley's office, and her name had been signed to the contract by Mrs. Hanlon. Plaintiff said she had seen Mrs. Hanlon in the office but did not know her name or who she was. The deal was closed in plaintiff's lawyers' office, September 13, 1944, the papers having previously been sent to Bradley's office for Mrs. Reese to sign. Bradley delivered his company's check for $1,560 ($1,800 less commission with tax adjustments) on which was marked "Payment Reese Escrow Acct.". He also delivered a $3,500 note and trust deed signed by Mrs. Reese; the note providing for principal and interest payments on February 10th and August 10th of each year. The deed from plaintiff to Mrs. Reese was delivered to Bradley and recorded. However, Mrs. Reese had previously executed a deed to Mrs. Hanlon for this property, which was never recorded. Mrs. Reese died before the trial of this case and Mrs. Hanlon, as her sole heir, inherited her property.

According to Bradley and Mrs. Hanlon, plaintiff fixed a price of $5,300 for the 53 acres, while in his office, and he said to Mrs. Hanlon in the presence of plaintiff: "Do you think your mother would be interested in buying this piece of property?" They said that, after further discussion in plaintiff's presence, Mrs. Hanlon said she would talk to her mother about it. Mrs. Reese lived in Wellsville, Kansas, and they said

she did go with Mrs. Hanlon to look at the land; and that after they had done so, plaintiff was told that Mrs. Reese would buy it. Mrs. Hanlon signed the name of Mrs. Reese to the contract but said plaintiff was present at the time. Plaintiff denied that there was ever any conversation in her presence to indicate that Mrs. Reese was Mrs. Hanlon's mother. Plaintiff also had evidence of four other transactions handled by Bradley afterwards in which conveyances were made to or by Mrs. Reese.

■ It seems apparent from the specific findings the court made and the result reached, that defendants' version was not accepted. It likewise seems apparent from the whole record that plaintiff was never told who Mrs. Reese was or where she lived. The deed to her, executed by plaintiff, states the grantee to be "Mary C. Reese of Jackson County, Missouri." This same residence is shown on deeds to or from her in the other subsequent transactions. The first information to plaintiff that Mrs. Reese was Mrs. Hanlon's mother, definitely shown by the record, was in a September 1946 letter sending a check signed by Mrs. Hanlon for the interest and principal payment then due. Even that letter did not show the actual residence of Mrs. Reese, but indicated she had a Kansas City address, and did not show that Mrs. Hanlon had any connection with the Bradley Company. This letter and two following it were on blank stationery. The rule that a broker employed to sell property cannot sell to himself extends also to employees or near relatives, Curotto v. Hammack, 362 Mo. 457, 241 S.W.2d 897, 26 A.L.R.2d 1302, annotation 26 A.L.R.2d 1307; 12 C.J.S., Brokers, § 42, page 103; 2 Am. Jur. 208, Sec. 257; Restatement of Agency, Sec. 389; as to agents selling for their own benefit see Utlaut v. Glick Real Estate Co., Mo.Sup., 246 S.W.2d 760 and cases cited. This rule should be especially applicable in this case where the testimony of Bradley was that, since he paid Mrs. Hanlon a very small salary, if he got a chance to make her some money on a deal he did so. (Mrs. Hanlon said she used her mother's money "seeing that if we could make a little money on it, and if an investment came in, I was

there in the office, we could use the money for investments with the consent of Mr. Bradley that the property was good.") Furthermore, at all times, Mrs. Hanlon was an actual owner, holding a deed for the 53 acres made to her by her mother. Thus it is immaterial to plaintiff's right of relief whether or not Bradley had an actual interest in the transaction.

Defendants' explanation did not convince the trial court and it is certainly far from convincing. Mrs. Reese was 89 when she died in 1950. She was deaf and when her deposition was taken in 1947 she only gave such answers to questions concerning the amount of money she had as were suggested to her by Mrs. Hanlon. However, she stated without prompting that she owned the house in Wellsville where she lived and also owned some town lots there. Mrs. Reese and Mrs. Hanlon also owned a farm of 76 acres located in Kansas which was part of the estate of Mr. Reese. The farm and the lots were traded in 1942 for property in Jackson County. This was deeded to Mr. and Mrs. Hanlon and they conveyed a life estate to Mrs. Reese. (Mr. Hanlon died in 1943.) This property was sold in 1943 for $4,219.60 cash and a mortgage note of $1,850; and part of the proceeds were used to purchase another place. When the Kansas farm was traded, it was subject to a mortgage of $1,500 made in 1936, signed by Mrs. Reese and Mr. and Mrs. Hanlon, providing for 10% interest. In 1943 Mrs. Hanlon also sold personal property which had belonged to her husband and used most of the proceeds to buy an automobile. While there could have been enough money left from these transactions to make the $1,800 cash payment to plaintiff on the 53 acres the next year, defendants claim that Mrs. Reese handled all the other four deals, in which she later took title, with her own money. These involved much larger amounts. In one of them the seller received a Bradley Company check for $10,085.85; in another a check for $7,000 was given for a mortgage, and another was a $21,000 deal in which Mrs. Reese executed a $13,000 note and deed of trust and later conveyed the land to a corporation in which Bradley and his wife had a very substantial interest.

Defendants' explanation was that Mrs. Reese was afraid of banks and kept large amounts in cash, although she did have a small bank account in Wellsville and had never lost any money in bank failures. Mrs. Hanlon said her mother had received more than $25,000 from bachelor brothers who died in Colorado, but there were no corroborating records offered in evidence and this testimony was finally stricken as hearsay. Bradley said he went to Wellsville with Mrs. Hanlon, got $7,300 in bills from Mrs. Reese and gave her his receipt for it; yet he said there never was a record of any kind as to what was done with this money, for which he had thus assumed responsibility. According to the testimony of both Bradley and Mrs. Hanlon, Mrs. Reese's money (they said more that $10,000) was kept in one drawer of Bradley's safe and his company money was kept in another drawer; and when a deal was made involving Mrs. Reese, Mrs. Hanlon would simply take money out of one drawer and put it in the other; but there was no record made of such transactions. However, a very detailed ledger sheet was produced to show the items of the previous deal disposing of the property for which Mrs. Reese and Mrs. Hanlon traded their Kansas farm, although this transaction involved much less money than the other later ones. This sheet also showed the payments and income on the 53 acres. Defendants' testimony was that Mrs. Reese did not want to give a mortgage on the 53 acres because she had so much money on hand and was persuaded to do so with great difficulty because plaintiff insisted on a mortgage with payments which would give her an annuity over a period of ten years. Nevertheless, the note provided for prepayment of all future installments at any time. Furthermore, in May 1946, Mrs. Reese executed a mortgage for $13,000, requiring semi-annual principal payments of $650, on the property later deeded to the corporation in which Bradley and his wife were interested; and Mrs. Reese also car-

ried a mortgage for years on her principal real estate asset (the Kansas farm) on which the interest rate was ten per cent.

■■ Defendants say the evidence as to the subsequent transactions, in which Mrs. Reese took title, "was remote and did not tend to prove a single issue of fact." They say this evidence lacks relevancy and was also inadmissible "under the rule of res inter alias acta"; that "a thing done between others" is not admissible. They argue that "in none of these transactions is it claimed that Bradley, directly or indirectly, became the purchaser of the property involved." Defendants certainly overlook the fact that, in the transaction in which Mrs. Reese executed the $13,000 mortgage, she did convey the land to the corporation in which Bradley and his wife had a very substantial interest; and also plaintiff's claim that Mrs. Reese was a straw party for Bradley in all of them. We think this evidence was relevant and very convincing to show that Mrs. Reese did act as a straw party; especially so in view of defendants' lame explanation of these subsequent transactions involving claims of large sums kept in currency without satisfactory explanation of its source, without any records of its acquisition or use, and claimed to be handled in such an unusual way (both for an investor and a real estate corporation) as to complete all such transactions by moving currency from one drawer of a safe to another and back again. Moreover, Bradley said he did not think he had told the parties of the other transactions that Mrs. Reese was Mrs. Hanlon's mother; but he did also tell at least one of them, as he did plaintiff, that Mrs. Reese was seeking property to use as a home. Plaintiff's claim is one of fraud in falsely representing that he was making an actual sale as her agent to a bona fide independent purchaser. Fraud can be shown by circumstantial evidence; and other similar transactions in the course of a continuous, systematic course of dealing are admissible. Rice v. Lammers, Mo.App., 65 S.W.2d 151; 20 Am.Jur. 281, Sec. 303; 32 C.J.S., Evidence, § 581, page 437; 37 C.J.S., Fraud, § 113, page 424, this rule is also applied in criminal cases, see State v. Kornegger, 363 Mo. 968, 255 S.W.2d 765 and cases cited. "Fraud, like any other fact, may be established by circumstantial evidence. There are circumstances which have come to be recognized as indicia or badges of fraud, one of which circumstances alone may not prove fraud, but may warrant an inference of fraud, especially where there is a concurrence of several indicia of fraud." Bank of New Cambria v. Briggs, 361 Mo. 723, 236 S.W.2d 289, 291; Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297; Hendrix v. Goldman, Mo.Sup., 92 S.W.2d 733. Certainly, the unusual methods stated, considered with the relationship of the parties, the age and condition of Mrs. Reese, concealment of her identity, and the apparent attempts to make the transactions seem to be for a different purpose than the use actually made of them, would warrant the view obviously taken by the trial court; and that is the view we take of the evidence.

■ Whether Bradley was acting for himself or his employee Mrs. Hanlon or Mrs. Hanlon and her mother (who had previously owned property together) it was a violation of his duty to plaintiff to do so; and if he did so act (as the court must have found he did) without plaintiff's knowledge and consent, then the contract was voidable at her election. "The reason for this rule is that a person in employing a broker to negotiate a sale or purchase in his behalf bargains for the disinterested skill, diligence, and zeal of the agent for his own exclusive benefit. It is a confidence necessarily reposed in the broker that he will act with a sole regard to the interest of his employer as far as he lawfully may. Consequently, where he attempts to act for both sides, he is confronted with the impossible task of securing for each the most advantageous bargain possible." 26 A.L.R.2d 1307 annotation; 9 Am.Jur. 1036, Sec. 87; 12 C.J.S., Brokers, § 42, page 102; Restatement of Agency, Sec. 313. We hold that plaintiff's evidence, with the inferences that could reasonably be drawn therefrom, was sufficient to make a case for rescission; and that much of defendants' evidence tended to support this conclusion.

This leaves the question of whether plaintiff lost the right to rescind by unreasonable delay. The following facts are to be considered on this issue. At the time of closing the sale of the 53 acres, plaintiff told Bradley she had heard rumors that he was buying the property and that Mrs. Reese was a mere straw party for him. She said "he just laughed and said, 'you can hear anything.'" Plaintiff said she was inclined to believe him but discussed it with her lawyer and decided to go to the Rockhill Manor. She also said: "I did not believe him. That is why I went to the Rockhill Manor to check up and see if Mrs. Reese did stop at that hotel." She said she went there soon after the deal was closed; and that her suspicion was confirmed by the investigation she made there. (On defendants' objection she was not permitted to testify as to what she learned.) Later she said she did believe Bradley at the time the deal was closed but that after receiving Bradley Company checks for the two 1945 interest and principal payments on the mortgage note she thought her suspicion that Bradley was the buyer was confirmed and that in September 1945 she felt confident that Bradley was the buyer "from all the gossip and all the evidence I had * * * and these checks." During 1945, plaintiff had negotiations for the sale of the seven acres she owned east of the Highway with the Carter-Waters Corporation, which was proposing to build a Haydite block plant nearby. This required rezoning which Bradley opposed at several hearings. He said he did this at the request of many customers to whom he had sold property in that area. Nevertheless, plaintiff said, with the very firm conviction in her mind that Bradley was the real owner, she accepted and cashed the March 1946 check for the third principal payment and interest. However, she talked to her lawyer about these checks and he told her there was nothing suspicious about that because Mrs. Reese probably brought the money to Bradley and he was paying it as a matter of convenience to her.

Bradley was in the hospital with a heart condition much of the year after the spring of 1946. During the summer, probably early August, after plaintiff's lawyer had begun an investigation and called Bradley's office about it, Bradley called plaintiff's lawyer on the telephone from the hospital and was told by him that an investigation of the deal was being made, at plaintiff's request; and that he was getting ready to file suit but wanted to hear what Bradley had to say before he filed it. He said Bradley told him Mrs. Reese was the real purchaser, and lived out of town but that her daughter lived in Kansas City and he would ask her to come to see him (plaintiff's lawyer) about it. Mrs. Hanlon did not do so but in September 1946, she sent a check to plaintiff for the principal and interest payment then due, drawn on a different bank than the one Bradley used signed "Mary C. Reese Escrow Acct. by Vera J. Hanlon." This was after plaintiff's lawyer had talked to Bradley about his investigation. Plaintiff's lawyer compared this signature with the one on the original sale contract and decided both were in the same handwriting and said this made him very suspicious about the deal. He said that he did not know Mrs. Hanlon was an employee of Bradley until after this letter was received, and he told plaintiff not to cash the check. When the September check was not cashed, Mrs. Hanlon sent plaintiff a duplicate by registered mail in December 1946, saying she had stopped payment on the original, believing it to have been lost in the mail. In February 1947, she sent a check by registered mail for the first 1947 payment. Plaintiff did not cash any of these checks. It is significant that the check to the County Collector for the 1946 taxes (in December 1946) was a Bradley Company check instead of being drawn on the account from which the checks sent to plaintiff, by Mrs. Hanlon, were drawn. When Mrs. Hanlon asked plaintiff for the abstract in March 1947, saying the land was to be sold, this suit was begun so that it could not be sold to an innocent purchaser. Plaintiff's lawyer said he delayed filing suit because he

wanted to have some evidence and "didn't want to file a lawsuit on mere suspicion."

Apparently, the trial court relied on and followed Curotto v. Hammack, 362 Mo. 457, 241 S.W.2d 897, 26 A.L.R.2d 1302. In that case, a real estate agent employed by the plaintiff made a sale to his widowed mother-in-law who lived in his home. We held that these circumstances would ordinarily give the plaintiff the right to disaffirm the sale and, ordered judgment against the agent for the commission paid to him. However, we did not set aside the sale saying the suit was not instituted until 23 months after the transaction and 11 months after the grantee was declared incompetent, stating that the purchasing power of the dollar had declined steadily and materially during that time. It was pointed out that the record was silent as to the extent and condition of the grantee's estate; and it is not stated in that case when the identity of the grantee was learned. Likewise, no active concealment of material facts appears to have been shown in that case. Perhaps, under the circumstances of that case, the judgment ordered was adequate to do equity. Nevertheless, we are unwilling to say that mere lapse of time accompanied by a decline in the purchasing power of money will prevent rescission under the circumstances indicated by the record herein. It is true that "a party seeking to rescind for fraud or false representations must do so promptly and within a reasonable time, and the right is lost by failure to act in such a time on discovery of the fraud, or after it might have been discovered by the use of due diligence." 17 C.J.S., Contracts, § 432, page 914. See also 12 Am.Jur. 1027–1029, Secs. 446–447; 24 Am.Jur. 32, Sec. 208; Restatement of Contracts, Sec. 483. As these authorities show, an important consideration in determining the question of unreasonable delay is whether there has been a change of position by the party guilty of fraud or whether a third party has been prejudiced by the delay. See also Collins v. Lindsay, Mo.Sup., 25 S.W.2d 84; Leslie v. Carter, 240 Mo. 552, 144 S.W. 797; Jones v. Fidelity National Bank & Trust Co., 362 Mo. 712, 724, 243 S.W.2d 970, 979. Neither has been shown in this case. Plaintiff acted before there was a sale to a third person and defendant had made no changes or improvements. No doubt there has been an increase in the value of the property due to development of Kansas City, but there is nothing in the record about this and we judicially know that most of it has occurred since this suit was begun.

In addition to Curotto v. Hammack, defendants cite and rely on Blank v. Aronson, 8 Cir., 187 F. 241; Kingman-Moore Implement Co. v. Ellis, 125 Mo.App. 692, 103 S.W. 127; Ebel v. Roller, Mo.App., 21 S.W.2d 214; Restatement of Contracts Sec. 484 and Missouri Annotations. None of the cases cited present a situation such as this. In the Blank case [187 F. 245] (a case of a selling agent becoming the purchaser) the sale and conveyance was set aside although it was contended that the plaintiff "did not promptly and unevasively rescind the sale after being advised of defendant's fraud." The court said: "The well-settled rule on this subject is that one entitled to rescind a contract on the ground of fraud must announce his purpose to do so promptly, unconditionally, and unevasively upon the discovery of the fraud practiced upon him." However, the court held that the evidence was sufficient to support a finding of compliance with this requirement. In the Implement Co. case (a replevin action), the principal point discussed was the necessity of a tender before bringing the action, the court holding that this was necessary in an action at law based on rescission but not necessary in an equity suit for a rescission. In the latter case, the court said the tender and willingness to pay into court could be made in the pleadings; but in a replevin action, such as it was considering, the tender was required before suit. In the Ebel case, 21 S.W.2d, loc.cit. 216, the court said: "The trouble with plaintiff's position, in a nutshell, is that after discovery of the fraud which had been practiced upon her, instead of promptly announcing her purpose to rescind the transaction, she sold the property which she had acquired from the Rollers,

and thus elected to stand by the transaction and to accept the fruits thereof in so far as she might, looking to the defendants only for a recoupment of whatever losses she may have suffered in the deal." For a somewhat similar case see Bassett v. Brown, 105 Mass. 551. Sec. 484, Restatement of Contracts covers loss of power of avoidance by manifesting an intention to affirm, or by exercising dominion over things required to be restored, after discovery of fraud. Ebel v. Roller, supra, is cited in the Missouri annotations to this section, and extensively quoted, as an example of the situation covered by Sec. 484. We do not think these authorities are applicable to the situation in this case.

■ It is true that plaintiff was suspicious about the transaction from the start; but according to the evidence which the court believed, and which we think is convincing, there was active concealment of the facts by defendants and it continued right up to the time this suit was filed. In fact, defendants did not even claim that they ever made a full disclosure of the identity and residence of Mrs. Reese. They only said they referred to her as Mrs. Hanlon's mother in the presence of plaintiff. (Mrs. Hanlon said if plaintiff did not know her identity "then she was a very poor observing lady, because Mrs. Reese's name was constantly mentioned and I would say 'my mother.'") Not only did defendants never tell plaintiff where Mrs. Reese lived but in every deed in evidence to which she was a party her residence was stated as Jackson County, Missouri. Most of these other deeds did not appear of record until 1946 and the one to the corporation in which Bradley and his wife were interested was not made until February 1947, the month before this suit was commenced. We think plaintiff was diligent in investigating and having her lawyer make an investigation; and she did not get her information from a full disclosure by defendants. How could plaintiff have found out about Mrs. Reese any sooner than she did? Information as to the identity of Mrs. Reese came only when Mrs. Hanlon in September 1946 stated in the letter (sending the payment then due) that her mother was the owner. Even that letter did not disclose where she lived or that Mrs. Hanlon was a Bradley employee but it did afford some basis for learning those facts. Even then Bradley was telling plaintiff's lawyer the transaction was a bona fide sale to Mrs. Reese. Plaintiff and her lawyer still had little more than suspicion as a basis for rescission and were being prevented by defendants' concealment from getting the real facts. Under all the circumstances of this case, we think it is unreasonable to say that plaintiff's right to rescission was lost because she did not file her suit sooner. We think the trial court in following Curotto v. Hammack, supra, overlooked the studied concealment of material facts in this case which prevented discovery of the true nature of the transaction. We, therefore, hold that plaintiff had not lost the right to rescind when this suit was filed.

The judgment is reversed and the cause remanded with directions to enter a decree of rescission, cancellation of deeds and for an accounting.

All concur.

### On Motion for rehearing or to transfer to banc.

Defendants claim our opinion is based on a misinterpretation of the trial court's decree. Defendants say the decree should be construed as finding all issues for the individual defendants and that the finding as to plaintiff's unreasonable delay was merely a separate and unnecessary finding. Defendants further say that the finding against the corporation should be construed as a finding of failure to exercise due care and diligence in advising plaintiff as to the value of the property and the business advisability of selling it.

The trouble with all this is that the decree must be considered as a whole and not construed in separate parts as isolated paragraphs. Moreover, as to the basis of the corporation's liability, the corporation was acting solely through Bradley and the evidence was all as to fraud and not negli-

gence. Furthermore, most of the badges of fraud on the transaction were shown by defendants' own evidence. While we showed that before defendants' evidence came in, plaintiff had evidence "sufficient to make a case for rescission", when defendants' evidence came in we think it did make the entire evidence overwhelming on that issue. While we also think the trial court's decree shows that it had the same view as we have on this issue, we are convinced that it is the only reasonable finding that could be made from the whole record.

Defendants' motion is overruled.

All concur.